## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

UNITED STATES OF AMERICA,                    :
                                             :
                    Plaintiff,               :
                                             :
          v.                                 :          Criminal Action No. 05-12-GMS
                                             :
TRACY LAMAR FISHER,                          :
                                             :
                    Defendant.               :

### GOVERNMENT'S SENTENCING MEMORANDUM
### IN SUPPORT OF SENTENCING ENHANCEMENTS

## I.      PROCEDURAL BACKGROUND

       Tracy Lamar Fisher was indicted on February 22, 2005, in a one count indictment

charging him with being a felon in possession of a firearm, in violation of 18 U.S.C. §§922(g)(1)

and 924(a)(2).  He entered a plea of guilty on July 19, 2005.  The Court scheduled sentencing

for October 17, 2005.

       On September 19, 2005, the Pre-Sentence Officer issued the first Pre-Sentence Report.

The government and the defendant submitted certain objections in writing.  On October 11,

2005, the Pre-Sentence Officer issued a revised Pre-Sentence Report assigning the defendant a

final offense level of 29, including a three-point downward adjustment for acceptance of

responsibility.  Pre-Sentence Report of October 11, 2005 ("PSR") ¶¶35-39.  The offense level

included a four-point offense conduct enhancement under U.S.S.G. §2K2.1(b)(5) for use of the

firearm in connection with another felony assault and a six-point victim-related enhancement

under U.S.S.G. §3A1.2(c)(1) for assaulting an officer (an official victim).[1]  PSR ¶¶31, 32.  The

_____

       [1]The PSR also noted the applicability of an enhancement for reckless endangerment under
U.S.S.G. §3C1.2, but did not assign points for this enhancement because it assigned points for
the official victim enhancement instead.  PSR ¶33.

PSR indicated that the offense conduct enhancement under section 2K2.1(b)(5) rested on two independent grounds: (1) the use of the gun that was the subject of the instant offense by the defendant to engage in an attempted armed robbery immediately prior to his arrest; and (2) the use of the gun by the defendant to assault an officer while fleeing from the officer.[2] PSR ¶31. The PSR also assigned the defendant a two-point enhancement under U.S.S.G. §2K2.1(b)(4) because the firearm that was the subject of the instant offense was stolen. PSR ¶30. The defendant objected to all enhancements.

On October 17, 2005, the Court held an evidentiary hearing for the purpose of receiving evidence related to the enhancements assigned by the PSR. The government solicited testimony from Detective Jeffrey Silvers of the Wilmington Police Department. At the hearing, the Court indicated that it would not be prepared to assign the offense conduct enhancement under section 2K2.1(b)(5) for the robbery without hearing the testimony of the alleged victim, in part because of that victim's extensive criminal record, which included crimes of dishonesty. Transcript of Hearing of October 17, 2005 ("Tr.") at 66, 104. At the conclusion of the hearing, the Court requested briefing by the parties on the application of the enhancements under section 2K2.1(b)(5) and section 3A1.2(c)(1), in connection with the assault on the officer by the defendant, including whether the application of both enhancements constituted impermissible "double counting" for the same conduct. Tr. 104, 107. The Court also requested briefing on the application of the stolen weapon enhancement under section 2K2.1(b)(4). Tr. 106.

---

[2]Under Delaware law, pointing a loaded gun at an individual constitutes both felony aggravated menacing, see 11 Del. Code §602(b), and felony reckless endangering in the first degree. *See* 11 Del. Code §604.

## II.    PROPOSED FINDINGS OF FACT

Detective Jeffery Silvers of the Wilmington Police Department was on patrol the night of

January 15, 2005, in downtown Wilmington. Silvers had nearly eight years of experience with

the police department and was a member of its vice unit. Tr. 15-16. Silvers was on patrol with

his partner, Detective Andrea Janvier, who had nine years experience with the Wilmington Police

Department. Tr. 16. Janvier and Silvers were on duty in regular uniforms and marked police

cars. Tr. 16-17.

At approximately 7:15 p.m., a civilian on the corner of Adams and Carpenter Streets

flagged them down. The civilian drew their attention to two men who were walking about a

block away on Adams Street and told the officers that they had robbed him and that they had a

gun. Tr. 17-19. Adams Street was lit with street lights, and Silvers and Janvier could see two

men walking up the street. Tr. 20. They followed the individuals, who turned off Adams Street

and onto Fifth Street. The two men ran through an alley and into a neighboring alley, before

returning toward Adams Street. Tr. 22. Silvers could hear them climbing over the fences in the

yards of the homes on Fifth Street. Tr. 23. Silvers went to Adams Street to cut them off. Tr.

23. There was a wooden fence, about six feet high, separating a yard of a residence on Fifth

Street from Adam Street. Silvers saw the two men coming up over the fence. Tr. 23. Silvers

flashed a light on them and ordered them to stop. Tr. 23. These individuals were subsequently

identified as Tracy Lamar Fisher, the defendant, and Rashee Lamont Hunter.

Neither Fisher nor Hunter responded to Silvers' command, but dropped down the other

side of the fence. Tr. 23. Fisher and Hunter ran behind the fence in a southbound direction to

Adams Street. Tr. 23-24. Janvier had come over to Adams Street, when Silvers yelled at her that

Fisher and Hunter were coming out onto Fifth Street, causing her to turn around. Tr. 24. Silvers

saw them exit the alley and begin to run diagonally across the intersection of Fifth and Adams, heading southbound on Adams Street, with Hunter ahead of Fisher. Tr. 24, 25. There was a street light located at the southeast corner of Adams and Fifth Street, where Fisher and Hunter were running. Tr. 44, 69.[3]

Silvers pursued them on Adams Street, and Silvers closed the distance between him and Fisher to about four to six feet. Tr. 26. Janvier was running behind Silvers. Tr. 26. As Fisher reached the southeast corner of Adams Street and Fifth Street, Silvers saw Fisher reach down into his waistband and pull out a black handgun. Tr. 27. Silvers had a radio in his left hand. Tr. 28. When Fisher pulled out his gun, Silvers pulled out his gun with his right hand. Tr. 28. Fisher then turned the gun around and pointed it at Silvers. Tr. 27. From Silver's perspective, Fisher's gun was in line with Fisher's face. Tr. 28.

Silvers could see Fisher's finger on the trigger of the gun, and could see Fisher starting to apply pressure on the trigger. Tr. 28. Silvers had his finger on the trigger of his own gun, and started to pull his trigger. Tr. 28. At that point, Silvers saw Fisher's eyes shift to Janvier's

---

[3]The defense's witness also testified to the location of street lights in the area of Fifth and Adams and also Fourth and Adams. Tr. 95. The uncontradicted record evidence shows that there was some form of street lighting in the entire block of Adams Street between Fourth and Fifth Street, where the relevant events for sentencing purposes occurred. The defense's witness, in response to defense counsel's question regarding the "lighting conditions on Fifth and Adams Street," stated, "[t]here were like a couple street lights I think at the beginning of the block, maybe one in the middle. I can't remember specifically. It wasn't very well light." The defense claims that "[t]he light in the area where the crucial incident occurred is poor and not conducive to permitting anyone to see what the officer claimed occurred." *See* Defendant's Memorandum ("Def. Mem.") at 5. However, even the defense's witness did not suggest that the lighting conditions were so poor that there was a lack of visibility. Moreover, she admits that she cannot recall the exact conditions. The evidence therefore supports the officer's testimony that he could see the critical events occurring from a distance of four to six feet from him while on Adams Street, because there was sufficient street lighting on Adams Street at the intersections of both Fifth and Fourth Streets.

location, who was still running behind Silvers, to his left. Tr. 28. Silvers then noticed that

Fisher's grip on the gun began to relax and his wrist went weak. Fisher then threw his gun into

the middle of Adams Street, away from the corner of Fifth Street in the 400 block of Adams

Street. Tr. 28, 83. Silvers heard it land. Tr. 29. Silvers then tackled Fisher to the ground and

placed him into custody. Tr. 29. Fisher was tackled on Adams Street, just north of Carpenter

Street. Tr. 45.[4]

When another officer, Detective Prado, arrived at the scene, Silvers told him that

Fisher's gun was in the middle of the street, and Prado retrieved it and gave it to Silvers. Tr. 29.

Fisher's gun was a .38 caliber Smith and Wesson. Tr. 37. Silvers later examined the gun and

found that it contained one bullet in the revolver chamber, and that the bullet was lined-up to

discharge if the weapon had been fired. Tr. 37, 40. Hunter was intercepted by officers and taken

into custody on Carpenter Street. Tr. 30. Officers later discovered Hunter's jacket in one of the

yards through which Fisher and Hunter had run while attempting to avoid officers, and found that

it contained a .25 caliber handgun. Tr. 39, 40.

On cross-examination, Silvers was asked about his written police report, which did not

contain all of the facts to which Silvers testified. His police report states:

> While these officers were chasing these subjects, this officer
> observed the subject in the black leather jacket and black-and-red
> sneakers pull a black handgun out of his waist area and run with the
> gun in his right hand. This officer then pulled his handgun and
> pointed it at the subject as he was running. The subject then began to
> turn the gun towards these officers and saw this officer
> approximately four to five feet behind him. The subject then threw
> the black handgun into the street in the 400 block of North Adams

---

[4] Carpenter Street intersects Adams Street on the east side of Adam's Street, just half-a-block south of the intersection of Fifth and Adams, *see* GX 1, where a street lamp was located. Tr. 44, 69.

Street. This officer then tackled the subject and took him into
custody. At this time, Officer D. Prado arrived at this location and
this officer told him to go into the street and recover the gun, which
he did.

Tr. 82-83.

Silvers acknowledged that all of the details of the incident to which he testified were not

in his police report, including Fisher's pointing the gun directly at him. He explained, however,

that the purpose of his report is not to document every fact that occurs, but to provide enough

information so that he will be able to accurately recollect the events of an incident as they

occurred. Tr. 55. He stated that he has no trouble remembering the events of the evening of

January 15, 2005: "There are very few times in my life that I have had a gun pointed at my face.

This is one of those times. I will never forget that. I relive that every day." Tr. 55.

After Fisher was arrested, he was given his Miranda rights. He told Silvers that he had

come to Wilmington by train. Tr. 33. He was asked about his identification and prior felony

convictions. Fisher refused to answer Silver's question about his prior felony convictions. *Id.*

Detective Pfaff took car keys from Fisher's person. Tr. 34. Pfaff then located a car

parked at 506 North Adams Street in Wilmington that matched the car keys taken from Fisher.

Tr. 34. Fisher was in possession of a Pennsylvania driver's license at the time of his arrest. Tr.

34; GX 3. Silvers also seized from Fisher's car numerous papers containing Fisher's name on

them. Tr. 35; GX2. Silvers took pictures of Fisher, which show that the defendant was dressed

in a black leather jacket with a white fur collar and red shoes at the time of his arrest. Tr. 39; GX

3 at A50.[5]    Silvers photographed Fisher's gun, a .38 caliber Smith & Wesson. Tr. 37-38; GX 3

---

[5]When Silvers first noticed Fisher on the night of Fisher's arrest, he saw that Fisher was
wearing a leather jacket with a fur collar and "very unique black and red sneakers." Tr. 74.

at A49.

Silvers listed several charges in his state complaint against Fisher. Silvers did not list a

charge of assaulting an officer against Fisher, because he did not believe that there is a charge for

such conduct against an officer in state court unless there is physical contact with the officer. Tr.

57-58. Silvers understanding of state court charging is that in most situations, a police officer is

not considered a victim absent physical contact with the officer. Tr. 76.

## III.   PROPOSED CONCLUSIONS OF LAW

### A.   This Court May Make Findings of Fact By a Preponderance of Evidence Standard to Enhance the Defendant's Sentence Under the Sentencing Guidelines Consistent With Booker.

The defense asserts that the "Booker line of cases instruct that a sentence imposing

punishment [is] only constitutional if all of the necessary facts supporting that sentence are found

beyond a reasonable doubt." See Def. Mem. at 7. The Supreme Court's opinion in United States

v. Booker, 125 S. Ct. 738 (Jan. 12, 2005), and the Third Circuit's opinion in United States v.

Miller, 417 F.3d 358 (3d Cir. 2005), have foreclosed this argument. In Booker, the Court, per

Justice Breyer's remedy opinion, invalidated 18 U.S.C. § 3553(b)(1), the section of the

Sentencing Reform Act that made the federal Guidelines mandatory, and 18 U.S.C. § 3742(e),

the section of the Act that provided for a de novo appellate review which was based on the

mandatory nature of the Guidelines. 125 S. Ct. at 756-69. So modified, the Court concluded, the

Act "makes the Guidelines effectively advisory." Id. at 756. Under Booker, the Guidelines will

be advisory in all cases, even where they could be applied without judicial fact-finding. Id. at

768.

Booker emphasized that, although the Guidelines are now advisory, the sentencing

process would proceed much as it did before Blakely. "[T]he Sentencing Commission remains in

-7-

place, writing Guidelines." 125 S. Ct. at 767. The Probation Office will continue to prepare

presentence investigation reports ("PSRs"), which as before should include "information (often

unavailable until _after_ the trial)" concerning the defendant's "real conduct." _Id._ at 759-60.

District court judges may as always "rely[] upon" a PSR, after "giving the offender an

opportunity to challenge the report." _Id._ at 760-62. The Court must calculate the Guidelines

range, considering evidence unrestricted by the "typical 'jury trial' evidentiary limitations," and

using the preponderance of the evidence standard. _Id._ at 759-60, 765, 767; _see_ McReynolds v.

United States, 397 F.3d 479, 481 (7th Cir. 2005) (Booker "held that decisions about sentencing

factors will continue to be made by judges, on the preponderance of the evidence"). In so doing,

the district court must consider all relevant conduct under U.S.S.G. § 1B1.3.

In Miller, the Third Circuit remanded a case for sentencing post-Booker. In doing so, the

Court noted the following:

> [T]he District Court is free to engage in precisely the same exercise
> in judicial fact finding as it did in February 2003, so long as such
> fact finding is consistent with Booker. _Cf._ United States v.
> Antonakopoulos, 399 F.3d 68, 75 (1st Cir. 2005) ("The error is not
> that a judge (by a preponderance of the evidence) determined facts
> under the Guidelines which increased a sentence beyond that
> authorized by the jury verdict or an admission by the defendant; the
> error is only that the judge did so in a mandatory Guidelines
> system."). . . . Finally, as was true when it conducted its sentencing
> in February 2003, the District Court is free to use its ordinary
> discretion in handling the various procedural issues (such as the
> admission of additional evidence) that may arise.

Miller, 417 F.3d at 363.

Other circuit courts addressing the issue agree that a defendant's "Guideline range should

be determined in the same manner as before" Booker. United States v. Mares, 402 F.3d 511, 519

(5th Cir. 2005); _accord_ United States v. Mooney, 425 F.3d 1093, 1102-03 (8th Cir. 2005) (en

banc); <u>United States v. Shelton</u>, 400 F.3d 1325, 1332 n.9 (11th Cir. 2005) ("A sentencing court

under <u>Booker</u> still must consider the Guidelines, and, such consideration necessarily requires the

sentencing court to calculate the Guidelines sentencing range in the same manner as before

<u>Booker</u>"); <u>United States v. Crosby</u>, 397 F.3d 103, 112 (2d Cir. 2005) ("Guidelines range is

normally to be determined in the same manner as before"), *abrogation recognized on other*

*grounds*, <u>United States v. Lake</u>, 419 F.3d 111, 113 n.2 (2d Cir. 2005); <u>United States v.</u>

<u>Antonakopoulos</u>, 399 F.3d 68, 75 (1st Cir. 2005).

**B.      The Defense's Claim Under the Fifth Amendment Due Process Clause Is
            Untenable After Booker.**

The defense suggests that post-<u>Booker</u>, the defendant still has a viable Fifth Amendment

objection to the finding of an enhancement at sentencing based on a preponderance standard.

The defense relies almost exclusively–and incorrectly--on <u>United States v. Siegelbaum</u>, 359 F.

Supp. 2d 1104 (D. Oregon 2005), for this claim. <u>Siegelbaum</u>, however, expressly declined to

comment on the appropriate standard of proof for sentencing enhancements. 359 F. Supp. 2d at

1108 note 1. Rather, the quotations taken by the defendant are out of context, and were made as

part of a retroactivity analysis by that court.[6]

The defense also fails to explain how the Due Process Clause interest recognized in

_____

[6]For example, the defense cites the following clause from a sentence from <u>Siegelbaum</u>:
"facts used to enhance a sentence, if not admitted, must be proven beyond a reasonable doubt
rather than by a preponderance of the evidence." Def. Mem. at 7 (quoting <u>Siegelbaum</u>, 359 F.2d
at 1107). In fact, the entire phrase is found in <u>Siegelbaum</u>'s distinction of the government's
reliance on <u>Schriro v. Summerlin</u>, 124 S. Ct. 2519 (2004), to argue against the retroactive effect
of <u>Blakely</u> and <u>Booker</u>:
          "<u>Schriro</u> addressed only the allocation of factfinding responsibility
          between the judge and jury. There is a second component to <u>Blakely/Booker</u>
          that <u>Schriro</u> did not address, namely, that facts used to enhance a sentence, if
          not admitted, must be proven beyond a reasonable doubt rather than by a
          preponderance of the evidence." <u>Siegelbaum</u>, 359 F.Supp.2d at 1107.

Apprendi v. New Jersey, 530 U.S. 466 (2000), and identified in In re Winship, 397 U.S. 358, 363-64 (1970), applies to sentencing procedure under an advisory federal sentencing guidelines scheme (which does not permit judges to impose sentences above statutory maximums). Apprendi held: "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Apprendi, 530 U.S. at 490.   The Booker remedy opinion held that the sentencing guidelines scheme, when rendered advisory and not mandatory, is consistent with the principles articulated in Apprendi.   See Booker, 125 S. Ct. at 764 (opinion of Breyer, J.).   Even Justice Stevens' opinion states that the Supreme Court has "never doubted the authority of a judge to exercise broad discretion in imposing a sentence within a statutory range." Id. at 50 (citing Apprendi, 530 U.S. at 481).

Similarly, the defense cannot look to Winship to support a new sentencing right. Winship held that "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." Winship, 397 U.S. at 364.   Winship, which dealt with juvenile adjudications, explicitly stated that "we are not here concerned with . . . the post-adjudicative or dispositional process" of juvenile adjudications. Id. at 359 note 1.   The Booker Court was not oblivious to Winship's holding.   The Due Process Clause interest identified in Winship is the starting point of the Court's constitutional analysis in Booker in Justice Stevens' opinion. See Booker, 125 S. Ct. at 748 (citing Winship, 397 U.S. at 364).   Justice Stevens' opinion and the remedy opinion presently foreclose any argument that Winship's narrow holding can be expanded to sentencing procedures beyond "the scope of Apprendi's requirement." See Booker, 125 S. Ct. at 764 (remedy opinion).   Justice Stevens primary opinion for the Court, having reviewed Winship and

-10-

Apprendi's central holdings, among other cases, *see id.* at 748-50, does not recognize any

constitutional interest under the current advisory federal sentencing guideline scheme akin to that

urged upon this Court by the defense. Justice Stevens states: "[T]he constitutional issues

presented by these cases would have been avoided entirely if Congress had omitted from the

SRA the provisions that make the Guidelines binding on the district judges." Booker, 125 S.

Ct. at 750.

### C.    U.S.S.G. § 3A1.1 Does Not Create Constitutional Vagueness Issues.

The defense also asserts that the principle of "constitutional avoidance" requires the court

to impose a proof beyond reasonable doubt standard for sentencing enhancements. The defense

asserts that because sentencing guidelines section 3A1.1, which addresses enhancements based

on hate crimes, requires that the enhancement be proved beyond a reasonable doubt, it follows

that all enhancements for other offenses in the guidelines must be based on proof beyond a

reasonable doubt. *See* Def. Mem. at 8. However, the argument cannot be reconciled with the

guideline commentary to Section 3A1.1 The enhancement was drafted in response to a

Congressionally mandated sentencing enhancement for hate crimes when the relevant facts have

been proven to a jury beyond a reasonable doubt. "To avoid unwarranted sentencing disparity

based on the method of conviction, the Commission has broadened the application of this

enhancement to include offenses that, in the case of a plea of guilty or *nolo contendere*, the court

at sentencing determines are hate crimes." Background Commentary to Section 3A1.1. Because

of the unique circumstances surrounding this section, Application Note 1 to Section 3A1.1

warns: "Subsection (a) applies to offenses that are hate crimes. Note that special evidentiary

requirements govern the application of this subsection." Thus, and contrary to the defense's

argument, there is no room to argue that the guidelines scheme is vague as to the appropriate

level of proof to be applied to all other offense and victim adjustments.

**D.** **The Uncontradicted Evidence Proves That Fisher Assaulted Detective Silvers With a Gun. Therefore, this Court Should Apply the Enhancements Under U.S.S.G. §§2K2.1(b)(5) and 3A1.2(c) to Fisher's Offense Level.**

U.S.S.G. §2K2.1(b)(5) states:　"[I]f the defendant used or possessed any firearm . . . in connection with another felony offense," the offense level should be increased by four levels. Pointing a loaded gun at another person, including an officer, constitutes a felony under Delaware State law.[7]　Section 3A1.2(c)(1) states:　"If, in a manner creating a substantial risk of serious bodily injury, the defendant . . . knowing or having reasonable cause to believe that a person was a law enforcement officer, assaulted such officer during the course of the offense or immediate flight therefrom," the offense level should be increased by six levels.

　　　　1.　**Application of Both Enhancements Does Not Constitute "Double Counting".**

　　　　　　a.　**Third Circuit Case Law.**

Although the government is not aware of a Third Circuit case addressing the application of both of section 2K2.1(b)(5) and section 3A1.2(c)(1), the Third Circuit has addressed similar "double counting" claims in other contexts.　In United States v. McNeill, 887 F.2d 448 (3d Cir. 1989), the defendant was convicted of soliciting the murder of his parole officer. He objected to the application of the official victim enhancement under Section 3A1.2, because section 2A1.2 (which applied to his offense of conviction) stated that no enhancements were applicable in the case of "mere solicitation."　The court rejected his argument, noting that a victim related enhancement should be "added if appropriate, regardless of the offense characteristics under Chapter 2" of the guidelines.　*Id.* at 455.　The court also noted that Section 1B1.1 instructed

---

　　　　[7] *See* <u>supra</u>, note 2.　*See also* PSR ¶31.

sentencing courts to determine the victim related adjustments under Chapter Three after applying

all specific offense characteristics in Chapter Two. *Id.*

Subsequently, in United States v. Wong, 3 F.3d 667 (3d Cir. 1993), the Third Circuit

directly addressed the issue of "double counting" when conduct was used to enhance a

defendant's sentence under both section 2B1.1(b)(5) (more than minimal planning in a financial

fraud context) and section 3B1.1(c) ("organizer or leader" role). The defendant argued that

"more than minimal planning is necessarily present whenever a defendant is an organizer or

leader," and that application of both sections was impermissible "double counting." *Id.* at 669.

The Third Circuit reject the argument. With respect to the application of both guidelines, the

court stated, "we effectuate the intent of the Sentencing Commission in enacting these two

guideline provisions." *Id.* at 671. The section 2B1.1 adjustment distinguished between simple

crimes and more complex ones, while the section 3B1.1 enhancement addressed "relative

responsibilities" of those involved in the offense. *Id.* at 671-72.

More broadly speaking to the issue of double counting under the guidelines, Wong stated

as follows:

> The Sentencing Commission's awareness of potential
> double counting issues is clearly reflected in other Guidelines
> provisions. Indeed, the Sentencing Guidelines are explicit when
> double counting is forbidden and identify the circumstances in
> which certain enhancements may not be applied. * * * Accordingly,
> an adjustment that clearly applies to the conduct of an offense must
> be imposed *unless the Guidelines exclude its applicability.*

*Id.* at 670-71 (citations omitted) (emphasis added).

Subsequently, in United States v. Green, 25 F.3d 206 (3d Cir. 1994), the Third Circuit

held that the official victim enhancement under Section 3A1.2(a) should be applied to a

defendant who was convicted of threatening a federal agent and his family. Green had threatened

-13-

a postal inspector and his family after the postal inspector tried to serve him and his mother with

grand jury subpoenas. *Id.* at 207-08. Green argued that because the statute of conviction

required the victim to be a federal officer, application of Section 3A1.2(a) constituted double

counting. *Id.* at 211. The court noted, however, that the offense conduct provision (section

2A6.1) under the guidelines that was applicable to Green's statute of conviction "contains no

provision enhancing the sentence where the victim is a government official." *Id.* The court

therefore concluded that application of Section 3A1.2 did not involve double counting. *Id.*

Finally, the commentary to Section 3A1.2 states that it should not be applied "if the

offense guideline specifically incorporates this factor. The only offense guideline in Chapter

Two that specifically incorporates this factor is 2A2.4 (Obstructing or Impeding Officers)."

Accordingly, pursuant to the plain language of the commentary and the Third Circuit's

instructions in Wong, Section 3A1.2 applies to a defendant's offense level, even if that offense

level is subject to an enhancement under section 2K2.1(b)(5). That is because neither the base

offense level under Section 2K2.1 (the felon in possession guideline) nor the felony enhancement

under Section 2K2.1(b)(5) incorporate the factor of assault on an official victim.

      **b.**    **Courts of Appeals That Have Considered the Application of**
               **Both Section 3A1.2 and Section 2K2.1(b)(5) Under the Felon In**
               **Possession Guideline Have Concluded They Both Apply.**

Several circuit courts of appeals have considered the application of Section 3A1.2 to

persons convicted of felon in possession. Those courts have concluded, under facts similar to

those presented in this case, that the official victim enhancement should be applied together with

the enhancement under Section 2K2.1(b)(5) for conduct constituting a felonious assault on an

officer. The offense adjustment under section 2K2.1(b)(5) addresses the nature of the offense

committed by a felon in possession defendant in comparison to other felons in possession by

focusing on the circumstances surrounding the possession of the weapon. The official victim adjustment under section 3A1.2 addresses the law enforcement status of the victim of the offense, a factor which is not ordinarily present in those felon in possession cases qualifying for the enhancement under section 2K2.1(b)(5).

The Tenth Circuit has upheld the application of section 3A1.2 to a felon in possession case involving an assault on an officer similar to the instant assault. In United States v. Coldren, 359 F.3d 1253 (10th Cir. 2004), officers approached the defendant in his car to investigate his agitated state. As the officer opened the door of the defendant's truck, the defendant pulled a semiautomatic rifle from between the seats and aimed it at the officer. He then sped away. Both section 2K2.1(b)(5) and section 3A1.2 were applied by the district court. The defendant appealed, arguing that this was impermissible double counting. The Tenth Circuit affirmed, holding that the enhancements, although based on the same conduct, applied to "distinct aspects of the defendant's conduct." In so holding, the court noted the following:

> [T]he guidelines demonstrate a clear intent to punish a convicted felon who uses a gun in connection with another felony to assault a police officer more severely than a convicted felon who uses a gun in connection with another felony without assaulting a police officer.

Id. at 1257. The court noted that under similar facts, the Eleventh Circuit had likewise concluded that both section 2K2.1(b)(5) and section 3A1.2 applied to a person convicted of felon in possession who reached for a gun while struggling with police. See id. (citing United States v. Jackson, 276 F.3d 1231, 1235-36 (11th Cir. 2001) (noting that the section 2K2.1 enhancement was a conduct related adjustment and the section 3A1.2 enhancement was a victim related adjustment)). See also United States v. Swoape, 31 F.3d 482, 483 (7th Cir. 1994) (affirming application of section 3A1.2 enhancement to armed robber who shot and injured police officers,

as well as other enhancements under section 2B3.1(b) based on shooting incident).[8]

The D.C. Circuit has also upheld the application of section 3A1.2 and section 2K2.1(b)(5) in a felon in possession case similar to that in Lee. In United States v. Bowie, 198 F.3d 905 (D.C. Cir. 1999), the defendant was convicted of being a felon in possession of a firearm. Officers approached wearing marked uniforms. Bowie attempted to shove one officer away. As the officers wrestled with Bowie, he kept reaching into his waist area. During the struggle, a loaded pistol fell out of his waist area. Id. at 907. The court of appeals concluded that Bowie's attempt to reach for a gun merited both enhancements. Id. at 913.

The Second Circuit recently approved of the application of both section 2K2.1(b)(5) and section 3A1.2(c)(1) to a defendant convicted of felon in possession under facts similar to the facts presented in this case. See United States v. Crosby, 397 F.3d 103 (2d Cir. 2005), abrogation recognized on other grounds by United States v. Lake, 419 F.3d 111, 113 n.2 (2d Cir. 2005). In that case, section 3A1.2(c)(1) was applied to the defendant because he pointed a loaded shotgun at the pursuing officer. (The 2002 version of the guidelines applied, so only a three level enhancement was applicable.) The defendant also received an enhancement under section 2K2.1(b)(5) for the same conduct, because the district court found it constituted the felony offense of first degree reckless endangerment under New York state law. Id. at 106. The Second Circuit remanded for re-sentencing in light of Booker, but gave the district court the

---

[8]The 2004 version of the Guidelines, which are applicable in this case, increased the Section 3A1.2(c)(1) enhancement from three to six points. The Sentencing Commission had the benefit of much of the case law cited in this memorandum at the time it enacted the increased enhancement. The fact that it did so without attempting to limit the simultaneous application of Section 2K2.1(b)(5) supports the Tenth Circuit's view that the Commission intended to punish more seriously those felons in possession of a gun who use the gun to assault an officer as opposed to assaulting a civilian–and with good reason: such individuals are likely to be more dangerous than the average felon in possession.

option of re-imposing the same sentence. *Id*. at 120.

The First Circuit has upheld the application of the official victim enhancement to a person convicted of being a felon in possession after he struck officers with his hands in an attempt to escape and reached for his gun in his waist. United States v. Lee, 199 F.3d 16 (1st Cir. 1999). The facts of the Lee case are not as serious as those of the present case, because Lee never drew the gun from his front waistband. Nevertheless, the court upheld the application of section 3A1.2,[9] stating that the defendant's "efforts to seize his gun did create a substantial risk of bodily injury, whether from accidental discharge or the threat of fire from the police." *Id*. at 17. Moreover, the court stated that Lee's conduct would fall within the "immediate flight" requirement.[10] *Id*. Finally, the Lee court found that the defendant's conduct constituted an assault, because he was aware that officers were ordering him to submit to arrest while reaching for the gun. *Id*. at 20. The Lee court was not presented with the question of whether Section 2K2.1(b)(5) should also be applied, but its opinion is instructive on the question of the threshold of conduct required to trigger the guideline application.[11]

---

[9]At the time of the Lee case, the relevant language in the guideline was in subsection 3A1.2(b). At least two amendments to section 3A1.2 ensued since Lee.

[10]In this case, Fisher's conduct was committed "in the course of" the offense of felon in possession (because he was a felon in possession when he assaulted the officer). It can also be argued, however, that his awareness of the illegality of his possession of a firearm (e.g., his attempt to discard the firearm after assaulting the officer) was one reason he was in flight from officers. Thus, his assault on the officer also could be characterized as committed during "immediate flight" from the offense of conviction.

[11]Other courts of appeal have likewise upheld the official victim enhancement to fact patterns involving assaults on officers during the course of or in flight from the offense of conviction. *See, e.g.*, United States v. Harrison, 272 F.3d 220, 222-23 (4th Cir. 2001) (affirming application of section 3A1.2 enhancement to participant in armed bank robbery because *co-defendant* fired at officers while fleeing); United States v. Miner, 108 F.3d 967, 969 (8th Cir. 1997) (affirming defendant's firearms convictions and sentencing enhancements

-17-

### 2.     The Section 2K2.1(b)(5) Enhancement and the Section 3A1.2(c)(1) Enhancement Are Applicable To Fisher's Conduct.

The facts in this case are remarkably similar to or more egregious than those reported in the preceding cases involving the application of Section 3A1.2 to felon in possession offenders. The uncontradicted evidence shows that Fisher pointed a loaded gun at Detective Silvers when he was in flight from Silvers, and that at the time he did so, Fisher's gun had one remaining bullet that would have discharged if the gun was fired. The evidence also shows that Fisher had his finger on the trigger and was beginning to apply pressure, when he noticed that Silver's partner, Janvier, was behind Silvers. Fisher had only one bullet left. The evidence shows that Silvers was prepared to fire his weapon, but then noticed Fisher's eyes focus on Janvier and Fisher's grip simultaneously relax, before Fisher tossed the gun into the middle of Adams Street.

Fisher's conduct constituted an assault on Silvers that placed Silvers in "substantial risk of serious bodily injury," if not death. *See* U.S.S.G. §3A1.2(c)(2). Fisher also knew, or reasonably should have known, that Silvers was a law enforcement officer when he pointed a loaded gun at him, because Silvers was wearing a marked uniform, Silvers had ordered him to stop and flashed a light on him, and Silvers and his partner had originally pursued Fisher from a marked police car. Fisher was running from Silvers and Janvier to avoid arrest. *See id*; Lee, 199 F.3d at 20. Finally, the assault was committed "during the course of the offense" of felon in possession "or immediate flight therefrom." *See* U.S.S.G. §3A1.2(c)(2); Lee, 199 F.3d at 17.

---

pursuant to sections 3A1.2 and 3C1.2 based on ramming car into a police roadblock); United States v. Alexander, 48 F.3d 1477, 1493 (9th Cir. 1995) (affirming section 3A1.2 sentencing enhancement imposed on defendants who shot at police during attempted getaway from armed robbery). *Cf.* United States v. Purifoy, 326 F.3d 879 (7th Cir. 2003) (approving application of section 2K2.1(b)(5) to felon who pointed gun at officer, but not having occasion to consider application of official victim enhancement).

Accordingly, Fisher's conduct falls within the official victim enhancement under Section 3A1.2(c)(1).[12]   Fisher's conduct also falls within the meaning of section 2K2.1(b)(5), because his conduct constitutes both felony aggravated menacing and felony aggravated assault under Delaware law.[13]

The defense disputes Silvers' version of events, but does not argue that if true, such conduct would not constitute an assault falling within the meaning of either of the guideline provisions, particularly section 3A1.2(c). Rather, the defense challenges Silvers' testimony primarily because some of the details of the assault are not in the police report. Silvers' report notes critical aspects of the incident in question, if not all aspects. Silvers wrote that Fisher removed his weapon and "began to turn the gun toward these officers." *That in itself would constitute conduct sufficient under* <u>Lee</u>, *199 F.3d 16, and* <u>Bowie</u>, *198 F.3d 905, to merit the official victim enhancement.* In both of those cases, the defendant never succeeded in pulling out his weapon, but had attempted to reach for it while struggling with officers. Significantly, the

---

[12]Moreover, even if section 3A1.2 were not applied, and the government respectfully urges its application, the two-level enhancement for reckless endangerment during the course of flight should then be applied. *See* U.S.S.G. §3C1.2. However, for reasons stated in <u>United States v. Lee</u>, 199 F.3d 16 (1st Cir. 1999), section 3A1.2(c)(1) is the more appropriate enhancement, because Fisher exhibited a clear purpose to assault the officer.

[13]Del. Code, Title 11 (Crimes), Section 602(b) provides: "A person is guilty of aggravated menacing when by displaying what appears to be a deadly weapon that person intentionally places another person in fear of imminent physical injury. Aggravated menacing is a class E felony."

Del. Code, Title 11 (Crimes), Section 604 provides: "A person is guilty of reckless endangering in the first degree when the person recklessly engages in conduct which creates a substantial risk of death to another person. Reckless endangering in the first degree is a class E felony." Pointing a loaded gun at another person may constitute reckless endangering in the first degree. *See* <u>Thornton v. State</u>, 647 A.2d 382 (Del. S. Ct. 1994) (unpublished disposition), 1994 WL 267300, at * 2 ("the act of pointing a loaded gun at the driver of another vehicle with the intention . . . to frighten that person" creates a substantial risk of death, in part from the "intentional or accidental discharge resulting in death").

defense has presented no evidence which contradicts this fact as reported in the police report.[14]

Silvers' report also notes the location of the incident consistent with his testimony. Silvers report states that Fisher threw his gun in the 400 block of Adams Street. During his testimony, Silvers testified that the Fisher threw the gun before being tackled near Carpenter Street, which intersects Adams Street between Fifth and Fourth Streets. There is no inconsistency between Silvers' testimony and the report on this point--both refer to the same location, contrary to the defense's suggestion. *See* Def. Mem. at 11. Silvers wrote in his report that Fisher was "four to five feet" in front of Silvers when the incident occurred, which is consistent with his testimony. Silvers also wrote in his report that Prado retrieved Fisher's gun, which is also consistent with his testimony.

Those facts to which Silvers testified that are not in the report are consistent with the report. Moreover, they are of such a compelling nature as to be the type of facts that are not easily forgotten by an officer, or for that matter, any civilian. Silvers testified that the instant case was one of the few times that he had a gun pointed in his face, and that he will never forget it and relives it every day. Tr. 55. Silvers also explained that the purpose of his report is not to document every fact, but to document sufficient information so that he may accurately recollect the events of an incident.

The defense also argues that Silvers could not have seen Fisher point a gun at him or place his finger on the trigger, even though he was only four to six feet from Fisher, because the

---

[14]The defense writes: "The credible facts do not include that any of the officers were shot at or that the gun was actually turned toward the officers. Instead, the police report states that the gun was thrown on the ground after the officer pointed his gun and was four to five feet behind Mr. Fisher." This characterization of the police report is incorrect. Silvers' report states that Fisher "began to turn the gun towards these officers." Tr. 83-83.

lighting was too poor to permit it. *See* Def. Mem. at 5, 11. However, the uncontradicted

evidence is that there was street lighting on Adams Street at the location of the incident. Even if

the lighting was weak–and the defense's lighting witness could not affirmatively recollect the

state of the lighting in the relevant location–the defense has not shown that the lighting was so

poor as to preclude all visibility, even at a range of barely two arms' lengths between people.

The defense makes some other minor arguments attacking the credibility of Silvers. The

defense claims that Silvers failure to charge Fisher with an assault against him is evidence the

assault did not occur. Def. Mem. at 10. However, Silvers explained that he did not believe that

an individual may be charged with assaulting a police officer absent physical contact with the

officer. The defense also claims that it is implausible that no one was shot if events occurred as

Silvers testified. Def. Mem. at 11. However, the defense has not offered any factual or expert

testimony to support this assertion. The record shows that Silvers was an experienced officer of

eight years who was reacting to every movement Fisher made with his hands and eyes when

Fisher pointed the gun at him.

Finally, the defense suggests that Silvers perjured himself before this Court out of

personal animosity toward the defendant simply because Fisher ran from him and refused to

answer his questions. *See* Def. Mem. at 12. That is a serious charge that should not be made

lightly. The defense's rationale for the motivation to commit perjury is flimsy, because there is

nothing exceptional about a defendant fleeing from officers or refusing to answer an officer's

question. Those things happen every day. Moreover, the defense cannot provide any credible

motivation for Silvers to perjure himself at the risk of his career, as well as that of his partner's,

herself an experienced detective. Presumably, Silvers would have had to conspire with her to

assure that they both perjured themselves if necessary.

-21-

**E.  The Enhancement for Possession of a Stolen Weapon Is Based on Strict Liability and May Be Applied Based On a Police Report.**

It is settled law in the Third Circuit that the enhancement for possession of a stolen weapon pursuant to U.S.S.G. §2K2.1(b)(4) is based on strict liability. United States v. Mobley, 956 F.2d 450, 459 (3d Cir. 1992). Moreover, in two non-precedential opinions, the Third Circuit has approved of the reliance on a police report to show that the firearm was stolen. See United States v. Matthews, 2005 WL 2465240, *3 (3d Cir. Oct. 6, 2005); United States v. Rucker, 61 Fed. Appx. 776 (3d Cir. 2002). Cf. United States v. Rogers, 46 F.3d 31 (7th Cir. 1995).

In this case, the government submitted a police report from the City of Chester Police Department (GX 5) to prove the enhancement. The police report ties Fisher to a gun reported stolen on August 10, 2003, by the serial number and the make of the gun. The police report bears sufficient indicia of reliability to sustain the government's burden. First, it is of relatively recent date–August 10, 2003–and was entered on what appears to be a computerized system. Second, it notes the serial number of the gun that was found on Fisher's possession. Third, the victim was not anonymous, but met officers at his home. The victim reported that he was the subject of a burglary. Officers investigated his home and found that all of his kitchen cabinets and bedroom drawers had been opened. The victim was also robbed of $100. The report therefore sufficiently demonstrates that Fisher was in possession of a gun that was previously stolen from its owner.

The defense's reliance on Shepard v. United States, 125 S. Ct. 1254 (2005), is misplaced. In Shepard, the Court addressed whether the sentence of a defendant convicted for felon in possession could be increased to 15 years under 18 U.S.C. §924(e) because of his prior conviction for burglary, a qualifying crime of violence for the statutory enhancement. The statute

required that a burglary conviction contain the necessary element of invasion of a home or

enclosed space to be used for the predicate enhancement. *Id.* at 1257. The Supreme Court

rejected the Government's attempt to find that the defendant's prior conviction constituted

burglary of an enclosed space based on police reports, where the charging statute and the court

documents did not provide the necessary element of burglary. The Supreme Court held that this

form of judicial fact-finding raised Apprendi concerns. *Id.* at 1260-62. The situation in Shepard

is qualitatively different than the use of a police report to enhance a sentence within the statutory

maximum. For reasons already reviewed above, the use of all available information–including

police reports–by a sentencing court to sentence a defendant within a prescribed sentencing range

does not raise Apprendi concerns.

## IV.    CONCLUSION

For the foregoing reasons, the government respectfully submits that this Court should

apply the enhancements assigned by the Pre-Sentence Report to Fisher's offense level.

Respectfully submitted,

COLM F. CONNOLLY
United States Attorney

BY: _____

Adam Safwat
Assistant United States Attorney

Dated: December 5, 2005

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | |
| v. | : | Criminal Action No. 05-12-GMS |
| | : | |
| TRACY LAMAR FISHER, | : | |
| | : | |
| Defendant. | : | |

### CERTIFICATE OF SERVICE

I, Adam Safwat, an Assistant United States Attorney in the Office of the United States

Attorney for the District of Delaware, hereby attest under penalty of perjury that on the 5th day of

December, 2005, I electronically filed the **GOVERNMENT'S SENTENCING**

**MEMORANDUM IN SUPPORT OF SENTENCING ENHANCEMENTS** with the Clerk of

Court using CM/ECF.  Said document is available for viewing and downloading from CM/ECF,

which will send notification of such filing(s) to the following:

Penny Marshall, Esq.
Federal Public Defender
704 King Street, Suite 110
Wilmington, DE 19801
Counsel for Defendant

Adam Safwat
Assistant United States Attorney
adam.safwat@usdoj.gov