

**U.S. Department of Justice**

*United States Attorney's Office*
*District of Delaware*

_____

*Nemours Building*                    *(302) 573-6277*
*1007 Orange Street, Suite 700*    *FAX (302) 573-6220*
*P.O. Box 2046*
*Wilmington, Delaware 19899-2046*

January 9, 2006

<u>Via ECF</u>

The Honorable Gregory M. Sleet
United States District Court Judge
District of Delaware
U.S. Courthouse
844 King Street
Wilmington, DE 19801

      **Re:**    **United States v. Tracy Lamar Fisher**
              **<u>Criminal Action No. 05-12-GMS</u>**

Dear Judge Sleet:

      The government writes in response to several factual assertions in the defense's reply brief that are based on evidence not previously introduced in the record.

      The defense states that Det. Silvers's testimony on January 24, 2005, during a state court preliminary hearing in this matter (before it was transferred to federal court) contradicts his testimony before this Court about where Mr. Fisher drew his gun and threw it. Def. Reply at 8. It does not. In his state court testimony, Det. Silvers stated that the incident occurred on Adams Street near Carpenter Street, which lies between Fifth and Fourth Street. *See* State Court Transcript at 5-6 (attached hereto). That is consistent with his testimony before this Court. *See* Transcript of Evidentiary Hearing of October 17, 2005, at 28-29, 45, 83.[1]

_____

      1. The defense insists that Det. Silvers's report, which states that the gun was found in the 400 block of North Adams Street, is inconsistent with his testimony that it was found on Adams Street between Fifth and Fourth Streets. *See* Def. Reply at 8; Def. Opening Mem. at 11. The only way that Det. Silvers's report can be inconsistent with his testimony on this point is if the reference to "the 400 block" is a reference to the block on Adams Street between Fourth and Third Streets, rather than Fourth and Fifth Streets. As any internet search on any map site will indicate (e.g., for the address "450 North Adams Street"), addresses located on the 400 block of North Adams Street in Wilmington fall between Fourth and Fifth Street on Adams Street. This

The Hon. Gregory M. Sleet
January 9, 2006
Page 2

Re: *United States v. Tracy Fisher*

---

The transcript of the state court proceeding was produced to the defense before the hearing on October 17, 2005. The transcript was therefore available for use in cross-examination of the witness. The previous testimony to which the defense refers is included in the following paragraph of Det. Silvers's testimony at the state hearing:

> As they ran, were, as Mr. Fisher was running across Adams Street, he reached in the waist and pulled out a black revolver in his right hand. I then continued to chase him southbound on Adams Street ordering him to stop. When I saw him draw his gun, or draw a gun out of his waist, I drew my gun and pointed it at him. He got about halfway down to Carpenter Street, which is probably thirty, forty feet south of 5th Street, and *began to turn around with his right arm with the gun in the hand towards me, with the gun pointing back towards me.*

State Court Transcript at 5 (emphasis added).

Second, the defense states that "a viewing of the weapon given its size, color and type make it highly unlikely that the officer could have observed the trigger being pulled." Def. Reply at 7 n. 2. Counsel viewed the weapon on January 5, 2005. Counsel's opinion does not constitute evidence.

Third, the defense asserts the officer's name on the evidence tag for the gun is neither that of Det. Silvers nor of the retrieving officer. *See* Def. Reply at 7 n. 2. However, the name on the

---

is consistent with the normal progression of street numbering. There is no evidence that Silvers understood otherwise when he wrote his report. Thus, the defense's assertion that "Mr. Fisher would have had to throw the gun a full block from the corner of Fifth and Adams and then across the four traffic lanes and two parking lanes of 4th Street to have reached the location specified," for the gun to have been found in the 400 block of North Adams Street, *see* Def. Reply at 8, is simply incorrect.

The Hon. Gregory M. Sleet
January 9, 2006
Page 3

*Re: United States v. Tracy Fisher*

_____

evidence tag is that of Det. Janvier, who was Det. Silvers's partner on the night of the incident in
this case.

Respectfully submitted,

COLM F. CONNOLLY
United States Attorney

BY: _____
Adam Safwat
Assistant United States Attorney

cc:    Penny Marshall, Esq.
       The Clerk of the Court

# IN THE COURT OF COMMON PLEAS

# FOR THE STATE OF DELAWARE

| | |
|---|---|
| STATE OF DELAWARE, | ) |
| | ) Preliminary Hearing – |
| v. | )               January 24, 2005 |
| | ) |
| TRACY L. FISHER, | ) Superior Court ID No. 0501011615 |
| | ) |
| Defendant. | ) |

BEFORE:

### COMMISSIONER MARY M. McDONOUGH

APPEARANCES:

### JULIE FESSEL FLANIGAN, ESQ.
#### for the State

### JOSEPH A. GABAY, ESQ.
#### for the Defendant

## TRANSCRIPT OF PRELIMINARY HEARING

2

## INDEX TO TESTIMONY

<u>STATE'S EVIDENCE</u>                                      <u>Direct</u>     <u>Cross</u>

**Detective Jeffrey Silvers.** . . . . . . . . . . . . . . . . . . . . . .        3            8

- - - - -

3

        MS. FLANIGAN:    State of Delaware vs. Tracy L. Fisher,

and I will call Detective Jeffrey Silvers to the stand.

**STATE'S EVIDENCE**

**DETECTIVE JEFFREY SILVERS**

        **DETECTIVE JEFFREY SILVERS, having been duly sworn**

**according to law, was examined and testified as follows:**

**DIRECT EXAMINATION**

BY MS. FLANIGAN:

    Q.    Detective Silvers, how long have you been with Wilmington

Police?

    A.    Seven years next month.

    Q.    And how are you currently assigned by them?

    A.    The Drug, Organized Crime and Vice Division.

    Q.    Are you familiar with Tracy L. Fisher?

    A.    Yes.

    Q.    Do you see Mr. Fisher here in the courtroom?

    A.    Yes.  He's seated at the defense table in the white (indicating).

    Q.    On the 16th day of January, 2005, you arrested Mr. Fisher for

a series of offenses that took place January 15th, 2005, is that correct?

    A.    Yes.

    Q.    In New Castle County, State of Delaware?

Silvers - direct                                        4

A.    Yes.

Q.    This lead charge is an attempted robbery first, is that correct?

A.    Yes.

Q.    What happened in that incident?

A.    My partner, Detective Janvier, and I were working a high visibility patrol. We were working in uniform that day in a marked police car. We came down 4th Street, turned northbound on Adams. As we were turning northbound on Adams, there was a subject standing on the corner who flagged us down, we stopped. He came over to the car, and pointed at Mr. Fisher and another subject, Mr. Hunter, and said that they had just robbed him, or tried to rob him, and that they had a gun.

We observed Mr. Fisher and Mr. Hunter walking northbound on Adams. They got to 5th Street and went eastbound on 5th. We then drove up Adams Street, turned the corner onto 5th Street and didn't see them in the street. There was a female standing on the south side of the street who was pointing to an alley on the north side of the street.

We drove down to the entrance of that alley, stopped, got out of the car. I then took a flashlight and shined it up that alley. At that point, we saw Mr. Fisher and Mr. Hunter in that alley climbing into a rear yard of, I believe it was 827 West 5th Street. They were the same subjects we saw walking northbound on Adams Street.

Silvers - direct                                        5

I then ran around to the 500 block of Adams Street, and my partner began to follow these subjects up the alley.  As I was on Adams Street, I looked across the rear yards, saw Mr. Fisher and Mr. Hunter going over fences, coming out towards Adams Street.  They got to the second to the last yard and popped up on the fence.  I then shined the flashlight on them and ordered them to the ground.  They then dropped off the fence and started running southbound through the yard, through an alleyway.

At that time, Detective Janvier came out to Adams Street.  I yelled to her that they were coming out to 5th Street.  She started running towards that alleyway.  I started running down towards that alleyway.  As I got to the corner, Mr. Fisher and Mr. Hunter were both running across 5th Street towards Adams Street; Mr. Fisher was behind Mr. Hunter.

As they ran, were, as Mr. Fisher was running across Adams Street, he reached in the waist and pulled out a black revolver in his right hand.  I then continued to chase him southbound on Adams Street ordering him to stop.  When I saw him draw his gun, or draw a gun out of his waist, I drew my gun and pointed it at him.  He got about halfway down to Carpenter Street, which is probably thirty, forty feet south of 5th Street, and began to turn around with his right arm with the gun in the hand towards me, with the gun pointing back towards me.

Silvers - direct                                6

At that point, I was about four to five feet behind him.  When he saw how close I was, he then threw the gun into the middle of Adams Street, and I tackled him and took him into custody.

Q.    Okay.  Is Mr. Fisher permitted to possess weapons in the State of Delaware?

A.    No, he's not.

Q.    And why is that?

A.    He was convicted in, I believe it was June of 1991 of a criminal homicide in Pennsylvania.

Q.    Okay.  And he has two charges of possession by a person prohibited.  One is for the firearm; what it the other for, detective?

A.    Correct.  One is for the firearm, and one is for the ammunition that was in the firearm.  There was one thirty-eight caliber bullet found inside the firearm.

Q.    Okay.  You, you indicated he pulled the weapon from his waistband.  Had it been concealed there prior to that, or were you able --

A.    I hadn't --

Q.    -- to see it?

A.    -- I hadn't seen it until he pulled it out.

Q.    Okay.  And there's also a charge of receiving a stolen firearm.  Was it discovered that the firearm Mr. Fisher possessed was stolen?

Silvers - direct                                          7

A.      Yes.  It was run through NCIC and came back as a stolen firearm out of Chester, I believe it was Chester City, Pennsylvania, in a burglary, and it was confirmed through Chester City that it was reported stolen.

Q.      Back to the attempted robbery, did the victim, he indicated that they had a handgun?

A.      Yes.

Q.      Was that pul, displayed or pulled out during the attempted robbery?

A.      Yes.

Q.      Okay.  And the other individual was arrested also?

A.      Correct.

Q.      Okay.  Did Mr. Fisher give a statement, Detective Silvers?

A.      No.  Detective Janvier Mirandized him, asked him if he knew why he was there.  He stated that he knew his rights and didn't have to talk to us.

MS. FLANIGAN:   Okay.  I have nothing further, Your Honor.

THE COURT:   Okay.

MR. GABAY:   Can I have one moment, Your Honor?

THE COURT:   Certainly, Mr. Gabay.

Silvers - cross                                                    8

MR. GABAY:    Thank you.

### CROSS-EXAMINATION

BY MR. GABAY:

Q.    Good afternoon, detective.

A.    Good afternoon.

Q.    As I understand it, there was a, a, one ammo shell in the firearm that Mr. Fisher supposedly threw into the middle of the street, right?

A.    Correct.

Q.    Okay.  What, what kind of round was that, do you know?

A.    Thirty-eight caliber.

Q.    The, did anybody tell, tell you where the gun came from?  I know you traced it, but did anybody, did Hunter tell you where the gun came from, or did Hunter just tell you where his gun came from?

A.    Hunter told us where his gun came from.

Q.    Okay.

A.    He --

Q.    He didn't tell you --

A.    -- didn't say anything...

Q.    -- where Fisher's gun came from?

A.    Didn't say anything about Mr. Fisher.

9

MR. GABAY:    That's all I have, Your Honor.  Thank you.

THE COURT:    Okay.  State have any re-direct?

MS. FLANIGAN:    No, Your Honor.  State will rest.

THE COURT:    Thank you, officer.

Does the defense have any evidence or argument?

MR. GABAY:    The only, the only argument I have, Your Honor, is the receiving a stolen firearm.  I'm not sure that, that this meets it.  It's a minor charge relative to the other ones.  I also always, I, I think, and I don't know the Court's position on this, but I, I think the argument's valid, that the ammunition, when it's located in the firearm, to me is a sense of piling on and duplicitousness, since an element of the firearm is it needs to be operable and capable of firing, and the, they're theoretically viewed as independent offenses, that if you have the ammunition somewhere else, is the way I believe the intention of the statute is, is meant to be interpreted, or should be interpreted.  So, to that extent, I think one of those charges needs to be kicked.  And then I would ask the bail be changed to secured, as opposed to cash.

THE COURT:    Ms. Flan...

MR. GABAY:    I'll note all the convictions were 1991.  The, I, I would report to the Court that my client tells me that the bank robbery charge, he was acquitted of in July of this past year.  So, there is a

**10**

disposition for that.

THE COURT:    Ms. Flanigan, what's the State's position, first of all, on the arguments on the two offenses that the defense moves to be dis, dismissed?

MS. FLANIGAN:    Your Honor, Your Honor, with respect to the bullet, it, the gun only has to be operable. That doesn't, I, I don't think that means having a bullet. I think in a case like this with the facts that Your Honor heard, where the defendant actually pointed the handgun at a pursuing police officer, that there is some seriousness to that, and it's not piling on the charge. I mean, the detective could have been killed in that situation, and I, I don't think that's piling on at all. I think those are both valid charges.

With respect to the receiving the stolen firearm, Detective Silvers did say he checked with Chester Police and that the gun had been reported stolen in a burglary. And Mr. Fisher did have possession of that. So, I'll, I'll leave that argument with...

MR. GABAY:    All right. Can I just quickly respond, Your Honor?

First off, I, I don't think the facts, whether they're serious or not serious, should dictate how we look at a decision. In other words, because this, in the State's mind, is a serious, more serious offense,

**11**

therefore, that means that the ammunition charge should stay, as opposed to not as serious, which maybe means it should go, which is the logistics of their argument. I don't think that's, that's right.

Secondly, one of the elements on the receiving stolen prop, stolen firearm is that it has to be acquired under circumstances you know create that the, the item was stolen. There's no evidence he didn't, that he, he got it under those circumstances. So, I don't think his intent has been established, even inferentially, at this point, to support that.

MS. FLANIGAN:    And Your Honor, in response to that, Mr. Fisher is not, is a convict, convicted felon. So, he could not have legally obtained that weapon. So, he had to obtain it under circumstances that, less than, than credible circumstances. He couldn't just go into a gun shop and purchase a weapon. So, I think that there is some credible evidence in the record to support the State's argument.

MR. GABAY:    I'm hoping, since I got to go first, I also get the --

THE COURT:    You --

MR. GABAY:    -- last under the general rules. So, I'll --

THE COURT:    -- you can.

MR. GABAY:    -- just say this. The fact of whether he's allowed to have a gun or not, Your Honor, is, is irrelevant to the fire, to the

12

stolen firearm charge; it's how was it acquired?  And, and while I agree

with Ms. Flan, Ms. Flanigan that, yes, that is correct that he's not allowed

to have it, it doesn't mean that just because he acquired it, it meets the

stolen firearm elements.  So, I, I think there's a distinction between the

two, and she's arguing oranges, I'm arguing apples, and I think this is an

orchard where they grow apples.  So, I think I'm right on this one.

THE COURT:    Or, it could be a tangelo.

In any event, I, I, as to the, the ammunition charge, I find

there's probable cause to support it, because I believe that for the other

charge, the gun, it, it is that it must be operable.  And I'm going to find

probable cause to support both of those offenses, both the gun and the

ammunition.

As to the receiving stolen property, I think at this stage in

terms of probable cause stan, standard, level of proof, there is enough

evidence to infer intent, given his prohibited status.  And, obviously, that

issue can be renewed in Superior Court.

So, at this point, I find that there is probable cause to support

the eight offenses charged, namely, attempted robbery in the first degree,

possession of a firearm during the commission of a felony, two counts of,

first possession of a deadly weapon by a person prohibited, possession of

the ammunition by a person prohibited, receiving a stolen firearm,

**13**

carrying a concealed deadly weapon, conspiracy in the second degree, and resisting arrest, and that these eight offenses were committed by Tracy Fisher. So, the matter will be bound over to Superior Court.

However, before that happens, the defendant has asked that bail be reviewed. Let me see if there's a Pretrial Report.

MR. GABAY:   There is, Your Honor.

MS. FLANIGAN:   There is, Your Honor. And I --

THE COURT:   Okay.

MS. FLANIGAN:   -- think counsel have both reviewed it.

THE COURT:   You both have had a chance?

MR. GABAY:   Yes, we have.

THE COURT:   Okay. Since we only have the one copy, do you -- thank you, thanks a lot.

Okay. Was there anything else, Mr. Gabay, you wanted to note in your request for modification, I think you were saying to secured from cash, is that right?

MR. GABAY:   Yes, Your Honor. I will tell you that he works at JP Mascaro, which is a trash company in, I'll, I'll say the Philadelphia region, since I'm familiar with them from where I grew up, that they, they, like any trash company, have a wide-ranging area. He, he's worked there for a, a period of six months. And as I said, relative to the

**14**

federal charges, he indicates he was found not guilty on that, which I would

suggest is probably accurate, otherwise, knowing the Federals' penchant

for no bail, he wouldn't be on the street.

        THE COURT:   Okay.

        MR. GABAY:   Or, of course, if convicted of a bank robbery,

he certainly wouldn't be on the street.

        THE COURT:   Right.

        Ms. Flanigan, what's the State's position on the bail request?

        MS. FLANIGAN:   Your Honor, I, I think the serious nature

of the charges alleged, that the facts that were given at, at the, during the

detective's testimony that show that Mr. Fisher is a danger to the

community, I think that cash bail is appropriate, especially given his prior

conviction on a criminal homicide.

        THE COURT:   I, I noticed that.

        MR. GABAY:   I think, I think, Your Honor, just quickly in

response, the, all those charges were alleged, appeared to have been

grouped in 1991.  We're now fourteen years removed, or thirteen plus

years removed.  I note that setting bail, it's -- and, and I'm not going to

dispute that on their face, these are very serious charges.  I mean, I think

we all would, would agree on that.

        I, in, in keeping with my standard rant against cash bail, let

**15**

me point out to the Court that setting this at seventy thousand cash is akin to setting bail at seven hundred thousand dollars, because we're basically talking about a ten percent posting through a bail bondsperson.

So, it realistically, if I look at homicide cases, and I see the bail there is two hundred to two hundred and fifty thousand secured up to a million for a non-capital first degree murder case, and then you look at this case, and you say, is this serious? The answer to that is yes, but is it so serious that it's at the extreme of that end? And I would say to the, to the Court, no. So, is seventy thousand a, a fair bail, yes. Is, is seventy thousand cash a fair bail, and I would suggest to the Court, no. I think seventy thousand secured -- and you'll note, I mean, it's not like he has a, it doesn't show a capias history. So, I, I think that's significant. He, he has a job; he can go back to it. He's got an address; he can be subject to Pre-trial monitoring. You know, I, I think that that's reasonable.

THE COURT:   Ms. Flanigan, what's the State's position on bail?

MS. FLANIGAN:   Your Honor, I, I just ask for Your Honor to keep the bail where it's set. Pretrial recommended no change, and I --

THE COURT:   Okay.

MS. FLANIGAN:   -- concur with their recommendation.

THE COURT:   Okay. In looking through Pretrial's report,

16

I am concerned with a number of factors they point out, including the serious out-of-state criminal record, that criminal homicide. They also note no known ties to the state, an alias. And frankly, here's where the seriousness of the charges does weigh in. Having listened to this testimony, we're very fortunate we're not dealing with a homicide in this case. We're very fortunate that that officer wasn't shot by this man. I'm leaving the bail the same, but adding a condition for Waiver of Ext, pre-signed Waiver of Extradition.

        MR. GABAY:   Thank you, Your Honor.

- - - - -

17

## CERTIFICATE OF REPORTER

I, Cheryl J. Simmons, Official Court Reporter of the Court of Common Pleas, State of Delaware, do hereby certify that the foregoing is an accurate transcript of the testimony adduced and proceedings had, as monitored and electronically recorded, in the Court of Common Pleas for the State of Delaware, in the case therein stated, as the same now remains of record in the Office of the Court of Common Pleas at Wilmington, Delaware.

WITNESS my hand this /7th day of April A.D., 2005.

Certificate No.   129-PS
Expiration Date:   Permanent