**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**


UNITED STATES OF AMERICA,    )
    )
    )
      v.    )    Criminal Action No. 05-12 (GMS)
    )
    )
TRACY LAMAR FISHER.    )


———————————————————————

Adam Safwat, Esquire, Assistant United States Attorney, Wilmington, Delaware.  Attorney for the United States of America.

Penny Marshall, Esquire, Federal Public Defender, Wilmington, Delaware.  Attorney for Defendant.

———————————————————————


**OPINION**


January 10, 2006.
Wilmington, Delaware



SLEET, District Judge

## I.   INTRODUCTION

On July 19, 2005, Tracy Lamar Fisher pleaded guilty to one count of unlawful possession of a firearm by a felon, in violation of 18 U.S.C.A. § 922(g)(1) (2000).   The maximum term of incarceration authorized by statute for a violation of § 922(g)(1) is ten years. 18 U.S.C.A. § 924(a)(2) (2000).   Presently before the court is a dispute between the parties as to the proper application of the United States Sentencing Guidelines.

## II.   BACKGROUND

At approximately 7:15 p.m. on January 15, 2005, Detective Jeffrey Silvers and Detective Andrea Janvier, both members of the Vice Unit (narcotics) of the Wilmington Police Department, were on "high visibility patrol" – meaning they were wearing regular police uniforms and driving in a marked police car – driving westbound on Fourth Street in downtown Wilmington.   (Tr. at 16:12-17:7.)[1]   As the detectives turned right from Fourth to North Adams Street, they were flagged down by a pedestrian.   (Id. at 17:3-7.)   The pedestrian pointed to two other pedestrians – later identified as Tracy Lamar Fisher and Rashee Lamont Hunter – walking northbound on North Adams, and informed Silvers and Janvier of his belief that Fisher and Hunter possessed a gun.   (Id. at 19:23-20:4.)   Upon receiving this information, Silvers and Janvier drove farther north and observed Fisher and Hunter turn eastbound on Fifth Street.   (Id. at 20:18-23.)   After a somewhat complicated chase, the details of which are unimportant here, the detectives ended up in a southbound footrace with Fisher and Hunter at the intersection of Fifth and North Adams.   (Id. at 25:19-25.)   Hunter led the

---

[1]"Tr." refers to the transcript of an evidentiary hearing held before the court on October 17, 2005.   Unless otherwise noted, all *material* facts in this section are undisputed and taken from the testimony of Silvers.

way, followed by Fisher, Silvers, and Janvier. (Id. at 26:1-22.)

About one car length south of the intersection, in an area illuminated by a streetlight, only "four to six feet" separated Fisher and Silvers. (Id. at 26:8-11; 68:4-10; 69:2-10.) It was there that Silvers observed Fisher withdrawing a firearm – later identified as a .38 caliber Smith & Wesson revolver – from his waistband. (Id. at 27:18-20.) In response, Silvers withdrew his own firearm and pointed it at Fisher. (Id. at 28:3-5.) Although Fisher denies it, he allegedly pointed his firearm toward Silvers and started to apply pressure to the trigger. (Id. at 28:5-8.) Silvers began to apply pressure to his trigger as well, but ceased doing so after he saw Fisher loosen his grip and throw the revolver into the middle of North Adams. (Id. at 28:8-24.) Silvers then tackled and arrested Fisher. (Id. at 29:13-14.) The .38 thrown into the street was immediately recovered by another officer who had arrived at the scene. (Id. at 29:15-17.) It was found to be loaded with a bullet positioned to fire as soon as the trigger was pulled. (Id. at 40:12-41:2.) Fisher later pleaded guilty before this court to one count of unlawful possession of a firearm.

## III.    DISCUSSION

Although the maximum term of incarceration permitted by statute is ten years, the ranges prescribed by the Sentencing Guidelines vary from 30-37 months at the low end (based on Fisher's base offense level, minus three points for acceptance of responsibility), to 108-120 months at the high end (based on three enhancements urged by the Government). Fisher makes several factual and legal objections to the Government's position, and argues that the 30-37 month range is appropriate in this case. On October 17, 2005, the court held an evidentiary hearing for the purpose of receiving testimony regarding the pursuit and arrest. At the close of the hearing, the court opted to defer ruling on most of the contested issues, and instead, instructed the parties to brief their outstanding disputes.

The court now rules in the manner described below.

### A.      Effect of Due Process on Judicial Factfinding

The process of sentencing a defendant in federal court is a methodical and deliberate process. Every defendant adjudged guilty of a federal crime is subject to a detailed presentence investigation conducted by a United States probation officer.  The investigating officer then uses the facts acquired during the investigation to prepare a detailed report which provides the sentencing court with comprehensive information regarding the defendant's background and the nature of the offensive conduct leading to his conviction.  The presentence investigation report is thus an invaluable tool for crafting a sentence tailored to the needs of both the defendant and society.  Though invaluable, because it is the product of human endeavor, the presentence report is neither infallible, nor completely objective.  However, the inherent subjectivity of that tool is counterbalanced by the objectivity of another sentencing tool at the court's disposal, namely, the United States Sentencing Guidelines.  These Guidelines, promulgated by the United States Sentencing Commission, provide federal courts with a set of step-by-step sentencing instructions covering a myriad of differently-situated criminal defendants.

Although the Guidelines have an initially daunting quality, their application is relatively straightforward.  *See generally* U. S. Sentencing Guidelines Manual § 1B1.1 (2004) (hereinafter USSG).  For a given defendant, the Guidelines assign him a number, referred to as the base offense level, which represents the Sentencing Commission's assessment of the seriousness of his offense – the higher the number, the worse the crime.  *Id.* § 1B1.1(a)-(b).  The base offense level is then adjusted upwardly or downwardly to account for various circumstances surrounding the offense conduct.  *Id.* § 1B1.1(c), (e).  In making these adjustments, the court is often required to find

3

additional facts, e.g., those revealed in the presentence investigation report, that have not been either admitted or found beyond a reasonable doubt by a jury, *see id.* § 6A1.3; Fed. R. Crim. P. 32(i)(3). After the proper adjustments are made, the result, frequently referred to as the total offense level, is used in conjunction with the defendant's criminal history category (also calculated by a process outlined in the Guidelines) to determine a prescribed range of incarceration. USSG § 1B1.1(f)-(h); *see also id.* ch. 5, pt. A (Sentencing Table). Until recently, the court was statutorily prohibited from imposing a sentence outside that range. 18 U.S.C.A. § 3553(b)(1) (Supp. 2005).[2]  Under this mandatory regime, in which the prescribed range created *de facto* statutory minimum and maximum sentences, the court's traditionally broad discretion in sentencing matters was dramatically curtailed.

That all changed, however, with the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220, 125 S. Ct. 738 (2005). There, the Court reaffirmed its Sixth Amendment holding in *Apprendi v. New Jersey*: "Any fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict *must be admitted by the defendant or proved to a jury beyond a reasonable doubt.*" *Booker*, 125 S. Ct. at 756 (emphasis added); *Apprendi*, 530 U.S. 466, 476 (2000). This presented a constitutional conflict with the mandatory Guideline regime which, by allowing the prescribed sentencing range to shift upward upon the *court's* findings of fact, effectively authorized increased statutory maximum sentences based on facts neither admitted by the defendant, nor found by a jury. Not surprisingly, the Court held that the requirements of the Sixth Amendment must prevail.

---

[2]Although sentences outside the Guideline range were statutorily permissible if the court found "that there exist[ed] an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission," § 3553(b)(1), those instances were rare, *United States v. Booker*, 543 U.S. 220, 125 S. Ct. 738, 750-51 (2005).

*Booker*, 125 S. Ct. at 755-56.

What was surprising about *Booker* (at least to some), was the Court's solution. Rather than engrafting a constitutional requirement onto the mandatory regime, the Court rendered the Guidelines advisory by severing and excising § 3553(b)(1). 125 S. Ct. at 756-57. The same fate befell 18 U.S.C.A. § 3742(e) (2000 & Supp. 2005), which provides instruction to the courts of appeals on enforcing the mandatory Guideline ranges in their review of sentences imposed by district courts. *Booker*, 125 S. Ct. at 756-57. The Court further held that § 3553(a), the still-viable provision of law setting forth the factors to be considered in imposing a sentence, implies a "reasonableness" standard of appellate review.[3] *Booker*, 125 S. Ct. at 765-66. The *Booker* solution thus presents a double-edged sword to criminal defendants. By restoring a significant portion of the court's traditional sentencing discretion, *Booker* lowered the hurdle for defendants seeking a sentence below the now-advisory Guideline range. By the same token, *Booker* also insulated the court's findings of sentence-enhancing facts from Sixth Amendment challenge (insofar as the sentence imposed is within the range permitted by statute). *Id.* at 750 (Stevens, J., opinion of the Court) (stating that under an advisory Guideline scheme, "the defendant has no right to a jury determination of the facts that the judge deems relevant"); *id.* at 764 (Breyer, J., opinion of the Court) ("the existence of § 3553(b)(1) is a necessary condition of the constitutional violation"); *cf. id.* at 790 (Scalia, J., dissenting in part) ("The majority's remedial choice is thus wonderfully ironic: In order to rescue from nullification a statutory scheme designed to eliminate discretionary sentencing, it discards the provisions that eliminate discretionary sentencing."). For better or for worse, that will remain the

---

[3]In the interest of precision, the court points out that courts of appeals are actually instructed to review sentences for "unreasonableness." *Booker*, 125 S. Ct. at 765. However, if there is any difference between a "reasonable" sentence and a "not unreasonable" sentence, it is quite subtle.

reality of the situation unless and until Congress determines to legislate to the contrary.

In apparent recognition of this reality, Fisher does not challenge the Government's proposed enhancements on Sixth Amendment grounds. Relying on *In re Winship*, 397 U.S. 358, 364 (1970),[4] he argues instead that the Due Process Clause of the Fifth Amendment requires any fact that would contribute to the imposition of a sentence above the range prescribed by the base offense level (i.e., above 30-37 months) to be proven beyond a reasonable doubt. His argument is unconvincing, however, because he fails to explain the constitutional significance of the *advisory* 30-37 month range. For example, in *Apprendi*, the Supreme Court held that a sentencing enhancement based on facts found by a preponderance of the evidence was unconstitutional because it exposed the defendant to punishment *beyond that contemplated by the statute* to which he pleaded guilty. 530 U.S. at 494 ("[T]he relevant inquiry is one not of form, but of effect – does the required finding expose the defendant to a greater punishment than that authorized by the jury's guilty verdict?"); *id.* at 495 (noting that *only* "[w]hen a judge's finding based on a mere preponderance of the evidence authorizes an increase in the maximum punishment, [is the finding] appropriately characterized as 'a tail which wags the dog of the substantive offense'"); *id.* at 481 ("We should be clear that nothing in this history suggests that it is impermissible for judges to exercise discretion – taking into consideration various factors relating both to offense and offender – in imposing a judgment *within the range* prescribed by statute.") (emphasis in original). Here, because the maximum punishment

---

[4]Although *In re Winship* was decided pursuant to the Due Process Clause of the Fourteenth Amendment, its holding also applies to the same clause in the Fifth Amendment. 397 U.S. at 378 n.3 (Black, J., dissenting) ("The Fifth Amendment applies this limitation to the Federal Government and the Fourteenth Amendment imposes the same restriction on the States."). *See also Booker*, 125 S. Ct. at 748; *Heiner v. Donnan*, 285 U.S. 312, 326 (1932) ("The restraint imposed upon legislation by the due process clauses of the two amendments is the same.").

contemplated by statute is ten years, *Apprendi* teaches that the range of imprisonment does not attain

constitutional significance until it exceeds 120 months (in terms of due process). Hence, a sentence

in the range of 38-120 months renders *Apprendi* inapposite.[5]

Fisher also points to *United States v. Huerta-Rodriguez*, 355 F. Supp. 2d 1019 (D. Neb. Feb.

1, 2005), *aff'd*, Nos. 05-1448, 1633, 2005 U.S. App. LEXIS 27957 (8th Cir. 2005) (merely holding

that the district court did not abuse its discretion and imposed a reasonable sentence) in support of

his argument. There, the court reasoned (post-*Booker)* that "the upper limit of a lawful sentence is

no longer the 'maximum term of imprisonment' under a statute that sets out a generally broad range

(i.e., the 'statutory maximum'), but the highest point within that range that is 'reasonable,'" *Huerta-*

*Rodriguez*, 355 F. Supp. 2d at 1024. Accordingly, the court held that due process requires all facts

serving to enhance the defendant's sentence beyond the "reasonable" range must be proven beyond

a reasonable doubt. *Id.* at 1027.

This court respectfully disagrees. In *Booker*, the Supreme Court explained at length its

rationale for excising § 3553(b)(1):

> Congress' basic statutory goal – a system that diminishes sentencing disparity –
> depends for its success upon judicial efforts to determine, and to base punishment
> upon, the *real conduct* that underlies the crime of conviction. . . . Judges have long
> looked to real conduct when sentencing. Federal judges have long relied upon a
> presentence report, prepared by a probation officer, for information (often
> unavailable until *after* the trial) relevant to the manner in which the convicted
> offender committed the crime of conviction.
>
> Congress expected this system to continue. That is why it specifically

---

[5]*Ring v. Arizona*, 536 U.S. 584 (2002), and *Blakely v. Washington*, 542 U.S. 296 (2004), are
likewise inapposite. As the Court explained in *Booker*, those cases also involved challenges to the
constitutionality of sentencing enhancements above the statutory maximum. 125 S. Ct. at 748-49.
By contrast, the United States does *not* urge the court to impose a sentence above the statutory
maximum in this case.

inserted into the Act the provision cited above, which (recodifying prior law) says that

> "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 USC § 3661 [18 USCS § 3661].

> This Court's earlier opinions assumed that this system would continue. That is why the Court, for example, held in *United States v Watts*, 519 U.S. 148, 136 L. Ed. 2d 554, 117 S. Ct. 633 (1997) (*per curiam*), that a sentencing judge could rely for sentencing purposes upon a fact that a jury had found *unproved* (beyond a reasonable doubt). . . .
> . . .

> To engraft the Court's constitutional requirement onto the sentencing statutes, however, would destroy the system. It would prevent a judge from relying upon a presentence report for factual information, relevant to sentencing, uncovered after the trial. In doing so, it would, even compared to pre-Guidelines sentencing, weaken the tie between a sentence and an offender's real conduct. It would thereby undermine the sentencing statute's basic aim of ensuring similar sentences for those who have committed similar crimes in similar ways.

*Booker*, 125 S. Ct. at 759-60 (emphasis in original). Given that excerpt, particularly with regard to the Court's treatment of facts "that a jury had found *unproved* (beyond a reasonable doubt)," this court cannot adopt the holding of *Huerta-Rodriguez* without ignoring the teachings of *Booker* (and, by implication, the intent of Congress). Moreover, the *Huerta-Rodriguez* court misconstrues the "reasonableness" requirement as a constitutional limitation, rather than the statutory requirement that it is. *Booker*, 125 S. Ct. at 766 ("[W]e read the *statute* as implying this appellate review standard [i.e., reasonableness].") (emphasis added).[6]

---

[6] In the context of his discussion of the *Huerta-Rodriguez* decision, Fisher contends that *United States v. Siegelbaum*, 359 F. Supp. 2d 1104 (D. Or. Jan. 26, 2005), and *United States v. Ochoa-Suarez*, No. 03-cr-747, 2005 U.S. Dist. LEXIS 1667 (S.D.N.Y. Feb. 7, 2005), support his argument as well. The court disagrees.

In *Siegelbaum*, the court was wrestling with the retroactive effect of *Booker* and *Blakely* on

The court also disagrees with the argument that this case is governed by the principle of "constitutional avoidance," which, according to Fisher, requires the court to choose the reasonable-doubt standard in order to avoid the constitutional problems raised by the preponderance standard. The problem with Fisher's argument is that, by resting on the assumption that the lesser standard raises constitutional problems in the first place, it merely begs the question at issue. This type of circular logic is simply not persuasive. Therefore, the court holds that it would not be an infringement of Fisher's due process rights to impose a sentence in the range of 38-120 months based on facts found by a preponderance of the evidence. *See United States v. Miller*, 417 F.3d 358, 363 (3d Cir. 2005) ("We merely note that the District Court is free to engage in precisely the same exercise in judicial fact finding as it did in February 2003, so long as such fact finding is consistent with *Booker*. *Cf. United States v. Antonakopoulos*, 399 F.3d 68, 75 (1st Cir. 2005) ('The error is not that a judge (by a preponderance of the evidence) determined facts under the Guidelines which increased a sentence beyond that authorized by the jury verdict or an admission by the defendant;

---

a defendant sentenced prior to either case. In so doing, the court acknowledged the importance of the reasonable-doubt standard, *Siegelbaum*, 359 F. Supp. 2d at 1107-08, but ultimately determined that "existing precedent [did] not definitively answer whether the rule announced in *Blakely/Booker* applies retroactively," *id.* at 1108. Nowhere does *Siegelbaum* address the proper standard for judicial factfinding in the advisory regime.

In *Ochoa-Suarez*, the court had enhanced a defendant's sentence prior to *Booker* because she qualified as a manager or supervisor under USSG § 3B1.1. *Ochoa-Suarez*, 2005 U.S. Dist. LEXIS 1667, at *4-5. After *Booker*, the court reconsidered its decision and reduced the sentence to the pre-enhancement level in recognition of the court's view that the enhanced sentence was inappropriate given the defendant's circumstances. *Id.* at *5. Although the court made a cryptic retraction of its prior comments "concerning the propriety of [the manager/supervisor] enhancement," it is unclear what was being retracted and why. *See id.* Suffice it to say, as with *Siegelbaum*, *Ochoa-Suarez* does not stand for the proposition that the court is constitutionally restricted from finding sentence-enhancing facts by a preponderance of the evidence (as long as the ultimate sentence is less than the statutory maximum).

9

the error is only that the judge did so in a mandatory Guidelines system.').").[7]

## B.    Guidelines Application

Though the Guidelines are only advisory, the court is required to consider them in crafting a reasonable sentence. *Booker*, 125 S. Ct. at 767 ("The district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing."). Fisher does not dispute that his criminal history category is properly set at III, or that his base offense level is properly set at 20, pursuant to USSG § 2K2.1(a)(4)(B). Likewise, neither Fisher nor the Government object to a three-level reduction for acceptance of responsibility, pursuant to USSG § 3E1.1, which brings his offense level subtotal to 17. The parties do disagree, however, regarding the Government's three proposed enhancements.

### 1.    Possession of a Stolen Firearm

Pursuant to USSG § 2K2.1(b)(4), if the court finds that the firearm in Fisher's possession was stolen, he is subject to a two-level enhancement. At the evidentiary hearing, the Government moved into evidence a 2003 police report in which it is alleged that a revolver with the same serial number as the revolver recovered in this case was stolen from its rightful owner by a burglar. (Gov't Ex. 5.) Fisher argues that the police report is legally insufficient to establish that the .38 was in fact stolen.

---

[7]In *United States v. Kikamura*, the Third Circuit held that, in cases where "the magnitude of a contemplated departure is sufficiently great that the sentencing hearing can fairly be characterized as a tail which wags the dog of the substantive offense," the facts justifying the departure must be supported by clear and convincing evidence. 918 F.2d 1084, 1101-02 (3d Cir. 1990) (quotations omitted). The *Kikamura* court was careful to explain, however, "that the clear and convincing standard is, under these circumstances, implicit in the *statutory* requirement [of now-excised § 3553(b)(1)] that a sentencing court 'find' certain considerations in order to justify a departure . . . ." 918 F.2d at 1102 (emphasis added). The court specifically "reserve[d] judgment on the question whether [the clear and convincing standard] is also implicit in the due process clause itself." *Id.* Therefore, *Kikamura* is inapposite to Fisher's constitutional argument.

In *Shepard v. United States*, 125 S. Ct. 1254 (2005), although the defendant pleaded guilty to a crime with a maximum authorized sentence of ten years, the fact that he had previously pled guilty to four counts of burglary under state law led the Government to urge at sentencing that he had committed a sufficient number of "violent felonies" to bring him within the ambit of the Armed Career Criminal Act ("ACCA") and its mandatory minimum sentence of fifteen years, 18 U.S.C.A. § 924(e)(1) (Supp. 2005), *Shepard*, 125 S. Ct. at 1257. However, since not all of the illegal activities encompassed by the state statute defining burglary were considered "violent felonies," the Government sought to demonstrate that the crimes the defendant committed were of the type contemplated by the ACCA through the introduction of the police reports corresponding to each burglary. *Id.* at 1258. The defendant objected to the Government's evidence as improper under *Taylor v. United States*, where the Supreme Court had previously concluded that § 924(e) "mandates a formal categorical approach," whereby the sentencing court is permitted to look at statutory definitions, indictments, informations, jury instructions, and the like, in determining the nature of the defendant's prior convictions, but "not to the particular facts underlying those convictions." 495 U.S. 575, 600-02 (1990). Drawing on the principle of *stare decisis*, the *Shepard* Court sided with the defendant by declining to further expand its interpretation of the ACCA statute – the police reports were inadmissible evidence of the defendant's previous offenses. 125 S. Ct. at 1261.

*Shepard* does not technically compel the conclusion Fisher urges because it (and *Taylor*) was decided entirely as a matter of statutory interpretation. *Shepard*, 125 S. Ct. at 1261 ("We are, after all, dealing with an issue of statutory interpretation, *see, e.g., Taylor*, 495 U.S., at 602, 109 L. Ed. 2d 607, 110 S. Ct. 2143 . . . ."). Moreover, although dicta in *Shepard* indicates that the Court construed the statute in the manner it did to avoid constitutional problems, 125 S. Ct. at 1262-63

11

(plurality opinion), those problems were implicated solely by virtue of the fact that the ACCA raised the defendant's exposure from a maximum of ten years to a minimum of fifteen years, *id.* at 1263 (Thomas, J., concurring in part and concurring in the judgment) ("*Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), and its progeny prohibit judges from 'mak[ing] a finding that raises [a defendant's] sentence beyond the sentence that could have lawfully been imposed by reference to facts found by the jury or admitted by the defendant.' *United States v. Booker*, 543 U.S. ___, ___, 160 L. Ed. 2d 621, 125 S. Ct. 738 (2005) (Thomas, J., dissenting in part). Yet that is what the Armed Career Criminal Act, 18 U.S.C. § 924(e) (2000 ed., Supp. II) [18 USCS § 924(e)], permits in this case."). Therefore, *Shepard* does not stand for the proposition that police reports are legally insufficient for the purpose of finding sentence-enhancing facts where, as here, the sentence urged by the Government is not greater than the statutory maximum. In fact, the *Taylor* Court specifically addressed this issue, stating that "[e]ven if an enhancement is not available under § 924(e), the Government may still present evidence of the defendant's actual prior criminal conduct, to increase his sentence for the § 922(g)(1) violation under the Federal Sentencing Guidelines." 495 U.S. at 602 n.10. The court thus holds that it may properly consider the police report for the purpose of this enhancement.

According to the report summary, on evening of August 10, 2003, Officer William Murphy of the City of Chester Police Department was dispatched to the home of a city resident who called the police upon discovering that his house had been burglarized. Officer Murphy inspected the victim's home and found that all of the kitchen cabinets and bedroom drawers had been opened. The victim also informed the officer that he was missing an unknown amount of cash, as well as "one Smith & Wesson model 10-H 38 special blue steel 4" barrel pistol serial #ALA-5543." (Gov't Ex.

12

5.) The firearm description and serial number reported by the victim are *identical* to the those of the firearm recovered in this case, which is very strong evidence that the stolen-firearm enhancement is appropriate. Fisher's primary response is to vaguely question the reliability of the burglary victim. In the court's view, the evidence presented actually bolsters the victim's reliability. Simply put, the odds are surely staggering that someone in Chester would report an erroneous serial number from his allegedly stolen .38 caliber Smith & Wesson revolver, only to have a revolver of the same type with the same serial number turn up just a few miles away in Delaware in the possession of a felon from Pennsylvania. Moreover, Fisher's criticism of the police report is based, not on actual evidence, but rather on pure supposition. Thus, the court believes the report contains sufficient indicia of reliability, and, therefore, finds by a preponderance of the evidence that the .38 caliber revolver in Fisher's possession was in fact stolen.

Fisher further argues that, regardless of the court's finding, the stolen-firearm enhancement is unreasonable due to the fact that he was incarcerated at the time the revolver was stolen. Under well-settled law, it is irrelevant whether Fisher knew the gun was stolen, or played any role in its theft, because section 2K2.1(b)(4) does not have a scienter requirement – mere possession is enough to trigger the enhancement. *See generally United States v. Mobley*, 956 F. 2d 450 (3d Cir. 1992).[8] *See also* USSG § 2K2.1 cmt. n.16. Also irrelevant is Fisher's contention that he would receive the same two-point enhancement if he had actually been the one to steal the revolver. Section 2K2.1(b)(4) is not a scheme to discourage stealing; it "is part of a comprehensive scheme to regulate the *movement* of firearms." *Mobley*, 956 F.2d at 453 (emphasis added). That the Commission may

_____

[8]In *Mobley*, the enhancement was pursuant to USSG § 2K2.1(b)(2) – the precursor to USSG § 2K2.1(b)(4). *See* USSG app. C (2003) (Amendment 374).

not have seen fit to impose an additional enhancement for the act of stealing (a fortuity for firearm

thieves) does not thereby entitle Fisher to escape accountability.  Thus, the court holds that a two-

level enhancement is appropriate in this case, which raises his offense level subtotal to 19.

### 2.    Use of a Firearm in Connection with Another Felony Offense

Pursuant to USSG § 2K2.1(b)(5), if the court finds that Fisher "used or possessed any firearm

or ammunition in connection with another felony offense," he is subject to a four-level enhancement.

The term "'[f]elony offense,' as used in subsection (b)(5), means any offense (federal, state, or local)

punishable by imprisonment for a term exceeding one year, whether or not a criminal charge was

brought, or conviction obtained." USSG § 2K2.1 cmt. n.4.  Delaware's criminal code classifies both

aggravated menacing, Del. Code Ann. tit. 11, § 602(b) (2001), and reckless endangering, Del. Code

Ann. tit. 11, § 604 (2001), as Class E felonies punishable by up to five years of imprisonment.  Del.

Code Ann. tit. 11, § 4205(b)(5) (2001).  As such, they are both "felony offenses" for the purposes

of subsection (b)(5).

### a.    Aggravated Menacing

"A person is guilty of aggravated menacing when by displaying what appears to be a deadly

weapon that person intentionally places another person in fear of imminent physical injury."  Del.

Code Ann. tit. 11, § 602(b).  Although the elements of aggravated menacing are readily discernable

from the plain language of the statute, the Delaware Supreme Court further elucidated those elements

in a recent unpublished decision:

> The [legislature's intent in adopting the aggravated menacing statute was] to
> elevate the misdemeanor crime of menacing to the felony crime of aggravated
> menacing if a defendant displays what appears to be a deadly weapon (even if it turns
> out not to be a deadly weapon).  The bill eliminated the need for the State to prove
> that the displayed weapon, in fact, created a substantial risk of death (an element of

14

felony reckless endangering) in order to convict the defendant of a felony-level crime.

. . .

Thus, . . . the focus of the aggravated menacing statute is on the victim's perception of the threat rather than on the actual risk of danger.

*Graham v. State*, No. 240, 2003, 2004 Del. LEXIS 134, at *10 (2004) (unpublished). Therefore, from the language of section 602(b) itself and the explanation in *Graham*, it is evident that the crime of aggravated menacing has three essential elements. First, the accused must have displayed what appeared to be a deadly weapon. Second, in so doing, he must have intended to cause another person to fear imminent physical injury. And third, the other person must have actually feared imminent physical injury. Because Fisher does not dispute that during the pursuit he displayed a .38 revolver – which unquestionably appeared to be a deadly weapon – the focus of the court's inquiry is on his state of mind and the effect of the display on Silvers.

Under Delaware law, "[a] person acts intentionally with respect to an element of an offense when . . . [i]f the element involves the nature of the person's conduct or a result thereof, it is the person's conscious object to engage in conduct of that nature or to cause that result[.]" Del. Code Ann. tit. 11, § 231(a)(1) (2001). Delaware law also provides that "[a] person is presumed to intend the natural and probable consequences of the person's act." Del. Code Ann. tit. 11, § 306(c)(1) (2001). This presumption is, of course, rebuttable, and it does not relieve the Government from the requirement that it prove all elements of aggravated menacing by a preponderance of the evidence (beyond a reasonable doubt in the context of a criminal prosecution). Del. Code Ann. tit. 11, § 306(e) (2001); *Plass v. State*, 457 A.2d 362, 366 (Del. 1983). Rather, it is merely an inference the factfinder (i.e., the court) is permitted to make. *Plass*, 457 A.2d at 366.

At the October 17 evidentiary hearing, the Government elicited the following testimony from

15

Silvers about the events that occurred during his pursuit of Fisher:

> Q       Now, describe what you saw Mr. Fisher doing.
>
> A       He pulled the gun out of his waistband, and as he was running, he brought the gun around and pointed it at me.
>
> Q       Now, did you happen to notice how his hand was placed on the gun?
>
> A       He had his finger on the trigger. When I saw the gun come out, I had a radio in my left hand. I pulled my gun out with my right hand. As he came around, his finger was on the trigger. I saw the pressure starting to get on his trigger, which [sic] I had my gun pointed right at the back of his head. I started to pull my trigger.
>
> Q       And why didn't you complete pulling the trigger?
>
> A       As this was going on, his gun was pretty much in line with his face. I saw his eyes. Detective Janvier was behind me to the left. I saw his eyes just quickly go over towards her, once he saw her, what I believe he saw with her being behind me –
>
> [Defense counsel's objection to speculation overruled.]
>
> A       She is behind me. I believe he saw her. She is very small in stature. With me running behind, initially, she is going to be harder to see. I saw his hand starting to go limp – not limp, but releasing the pressure, his wrist went weak and he threw the gun out in the middle of Adams Street. That's when, at that point, the threat was over of the firearm.

(Tr. at 27:23-28:24.)  Silvers also read into the record an excerpt from the police report he wrote

shortly after the incident:

> While these officers [Detectives Silvers and Janvier] were chasing these subjects [Fisher and Hunter], this officer [Silvers] observed the subject in the black leather jacket and black-and-red sneakers [Fisher] pull a black handgun out of his waist area and run with the gun in his right hand. This officer then pulled his handgun and pointed it at the subject as he was running. The subject then began to turn the gun towards these officers and saw this officer approximately four to five feet behind him. The subject then threw the black handgun into the street in the 400 block of North Adams Street. This officer then tackled the subject and took him into custody. At this time Officer D. Prado arrived at this location and this officer told

him to go into the street and recover the gun, which he did.

(Id. at 82:18-83:6.)  This evidence easily demonstrates that Fisher formed the requisite intent for

aggravated menacing.  Given his familiarity with firearms (as is revealed by the nature of his past

crimes), Fisher surely knew that "the natural and probable consequence" of moving the barrel of his

revolver in the manner described would be to put Silvers "in fear of imminent physical injury."  The

evidence also demonstrates that Silvers actually feared imminent physical injury.  If he did not, there

would have been little reason for him to withdraw his firearm in response to seeing Fisher's revolver.

Lest there be any doubt, defense counsel elicited testimony from Silvers on this very issue during

cross examination:

> Q    Sir, after you observed these events, nowhere in the police report did you say
> that Mr. Fisher pointed the gun toward you, did you?
>
> A    Correct.  The police report is not a do all, end all.  It is written so I can recall
> the event as it happened.  There are very few times in my life that I have had
> a gun pointed at my face.  This is one of those times.  I will never forget that.
> I relive it every day.

(Tr. at 54:23-55:5.)

The court's conclusions are unchanged by Fisher's attempts to undermine Silvers'

credibility.[9]  For example, it does not matter that Silvers testified that Fisher "brought the gun around

and *pointed* it at me," but wrote in the police report that Fisher merely "*began* to turn the gun."

Either way, it is clear from these statements – which remain uncontradicted by any other evidence

presented to the court thus far – that Fisher did not simply withdraw the gun from his waistband and

---

[9]Due to defense counsel's objection to the Government moving the entire police report into evidence (and the court's reluctant acquiescence thereto), the excerpts pointed to by Fisher are perhaps missing context and it is with a cautious eye that the court reviews his allegations regarding the content of the report.

17

discard it.  At the very least, he moved the barrel of the .38 toward Silvers in a threatening fashion.

Likewise, the court is not persuaded that there exist material inconsistencies regarding the order in

which the two firearms were withdrawn and pointed.  In the police report, Silvers wrote that (1) he

"observed [Fisher] pull a black handgun out of his waist area and run with the gun in his right hand,"

(2) he (Silvers) "then pulled his handgun and pointed it at [Fisher] as he was running," and (3) Fisher

"then began to turn the gun toward [his pursuers.]"  (Tr. at 82:19-24.)  On the witness stand, Silvers

recited the exact same order:

> Q    Now, did you happen to notice how his hand was placed on the gun?
>
> A    He had his finger on the trigger.  *When I saw the gun come out*, I had a radio
>      in my left hand.  *I pulled my gun out* with my right hand.  *As he came around*,
>      his finger was on the trigger.  I saw the pressure starting to get on his trigger,
>      which [sic] I had my gun pointed right at the back of his head.  I started to
>      pull my trigger.

(Id. at 28:1-8 (emphasis added).)  The court also finds no inconsistency regarding the location Fisher

threw his revolver.  Silvers wrote in his report that Fisher threw it "into the street in the 400 block

of North Adams Street" (id. at 83:1-2), and testified in court that Fisher threw the gun into the street

when he was one car length south of the intersection of North Adams and Fifth (id. at 30:12-18).

The court takes judicial notice of the fact that the section of North Adams immediately to the south

of Fifth *is* the 400 block.  Fed. R. Evid. 201(b).  Finally, the court does not find it particularly

noteworthy that Silvers did not cite Fisher with a crime for pointing the gun in the manner alleged

(e.g., aggravated menacing, assaulting a police officer).  Silvers explained in court that he did not

believe a crime is committed against a police officer unless there is physical contact and injury (Tr.

at 57:19-58:16), and the court has no reason to doubt the sincerity of his explanation (especially

given the overall consistency of his testimony with the other evidence).

18

In light of these findings, the court holds that the Government has proven the felony of aggravated menacing by a preponderance of the evidence. *See Wood v. State*, 836 A.2d 514, No. 274, 2003, 2003 Del. LEXIS 583, at \*3-4 (2003) (unpublished) (affirming a conviction for aggravated menacing where the defendant pointed a gun at another man during an argument). As such, the four-level enhancement is appropriate, which raises Fisher's offense level subtotal to 23.

### b.   Reckless Endangering

"A person is guilty of reckless endangering in the first degree when the person recklessly engages in conduct which creates a substantial risk of death to another person." Del. Code Ann. tit. 11, § 604. As with aggravated menacing, the elements of the offense are clear from the plain language of the statute: (1) the accused's conduct must have created a substantial risk of death to another person; and (2) the accused must have engaged in that conduct recklessly. In creating a substantial risk of death, there need not have been any actual physical injury to the other person. *Eaton v. State*, 751 A.2d 878, No. 300, 1999, 2000 Del. LEXIS 179, at \*5-6 (2000) (unpublished) (holding that "it is possible to cause 'a substantial risk of death' without ever causing a 'physical injury.'") Moreover, as Delaware's General Assembly made clear when it passed the aggravated menacing legislation, a person may create a substantial risk of death with a gun without firing a single bullet, as long as the gun is loaded:

> This bill will close a loophole in Delaware's criminal law. Currently, it is difficult to convict individuals who unlawfully threaten another with a gun of Reckless Endangering, because in order to do so the State may have to prove that the gun was loaded. Unless the gun is fired or the police recover the gun, the State may be unable to do so. This bill will remove the necessity of proving that a gun used to criminally menace another was loaded.

An Act to Amend Title 11 of the Delaware Code Relating to the Crime of Menacing, 70 Del. Laws,

c. 159 (1995) (Synopsis).  As to the second element, "[a] person acts recklessly with respect to an element of an offense when the person is aware of and consciously disregards a substantial and unjustifiable risk that the element exists or will result from the conduct."  Del. Code Ann. tit. 11, § 231(c) (2001).  "The risk must be of such a nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation."  *Id.*

Here, by withdrawing and pointing (or beginning to point) a loaded revolver at the detectives during their pursuit, Fisher created a substantial risk of death to both Silvers and Janvier.  Alternatively, even if Fisher merely withdrew the .38 to discard it, Silvers may have fired at the first sight of the weapon, perhaps killing Hunter (who was running in front of Fisher).  Furthermore, given Fisher's presumed familiarity with firearms and the criminal justice system, he was doubtlessly aware that by displaying a revolver during a police pursuit he created a substantial and unjustifiable risk that shots would be fired.  And yet, he consciously disregarded that risk, as evidenced by the fact that he withdrew the firearm nevertheless.  His actions were the very definition of reckless.  *State v. Witherspoon*, 1999 Del. Super. LEXIS 416 (1999) (concluding it was reasonable for a jury to find that the defendant acted recklessly after he provoked a gun fight that resulted in the shooting death of an innocent bystander, even though the fatal bullet was not actually fired by the defendant), *aff'd*, 781 A.2d 697 (Del. 2001).  The court thus holds that the Government has proven the felony of reckless endangering by a preponderance of the evidence.  Because this felony serves merely as an alternative to the aggravated menacing felony, Fisher's offense level subtotal remains at 23.

20

### 3.    Assault on a Police Officer (Official-Victim Enhancement)

Pursuant to USSG § 3A1.2(c)(1), if the court finds that Fisher, "in a manner creating a substantial risk of serious bodily injury . . . knowing or having reasonable cause to believe that a person was a law enforcement officer, assaulted such officer during the course of the offense or immediate flight therefrom," he is subject to a six-level enhancement. This enhancement is appropriate "in circumstances tantamount to aggravated assault . . . against a law enforcement officer[.]" USSG § 3A1.2 cmt. n.4(A). Once again, the elements are clear from the language of the provision itself: (1) the accused must have committed an aggravated assault against a law enforcement officer; (2) the accused must have known or had reasonable cause to believe that his assault victim was a law enforcement officer; (3) the assault must have actually created a substantial risk of serious bodily injury; and (4) the accused must have committed the assault during the course of the offense or immediate flight therefrom.

As no serious dispute exists that the latter three elements are satisfied, the court will focus on the first element. The Guidelines define "aggravated assault" as "a felonious assault that involved [among other things] a dangerous weapon with intent to cause bodily injury (*i.e.*, not merely to frighten) with that weapon." USSG § 2A2.2 cmt. n.1. Obviously, the incident under examination here involved a dangerous weapon. It is also fairly obvious that by turning (or beginning to turn) the .38 toward Silvers, Fisher committed common law, felonious assault. *United States v. Lee*, 199 F.3d 16 (1st Cir. 1999) (upholding a felonious-assault enhancement where the defendant unsuccessfully attempted to pull a loaded gun from his waistband during a struggle with police).[10]   The only

---

[10]In *Lee*, the enhancement was pursuant to USSG § 3A1.2(b)(1) – the precursor to USSG § 3A1.2(c)(1). *See* USSG app. C (Supp. 2004) (Amendment 663).

remaining question is whether Fisher acted with an intent to cause bodily injury, and not merely an intent to frighten. Given Silvers' testimony that he saw Fisher's finger starting to apply pressure to the trigger, it is entirely reasonable to conclude that Fisher intended, if only temporarily,[11] to cause bodily injury. Fisher contends it would not have been possible for Silvers to see a dark-skinned man putting pressure on the trigger of a black gun as they were running on a dark street. The court disagrees. When the gun-pointing incident occurred, the two men were running through an area illuminated by a streetlight and they were separated by just a few feet. The court concludes, therefore, that the aggravated assault element of the section § 3A1.2(c)(1) has been proven by a preponderance of the evidence. Therefore, the six-level enhancement is appropriate, which raises Fisher's offense level subtotal to 29.

### 4.    Double Counting

Fisher's final argument is that the court is not permitted to "double count" under the Guidelines. In particular, he says the court may not impose simultaneous enhancements under sections 2K2.1(b)(5) and 3A1.2(c)(1). However, the Sentencing Commission is of the opposite opinion:

> *Cumulative Application of Multiple Adjustments from Multiple Guidelines –*
> Absent an instruction to the contrary, enhancements under Chapter Two, adjustments under Chapter Three, and determinations under Chapter Four are to be applied cumulatively. In some cases, such enhancements, adjustments, and determinations may be triggered by the same conduct. For example, shooting a police officer during the commission of a robbery may warrant an injury enhancement under § 2B3.1(b)(3) and an official victim adjustment under § 3A1.2, even though the enhancement and the adjustment both are triggered by the shooting of the officer.

USSG § 1B1.1 cmt. n.4(B).    The Third Circuit case law is in accord with this view. *See, e.g.,*

---

[11]It is irrelevant that Fisher subsequently thought better of his actions and threw the gun into the street. Once he formed the requisite intent, the assault was complete.

*United States v. Green*, 25 F.3d 206 (3d Cir. 1994); *United States v. Wong*, 3 F.3d 667 (3d Cir. 1993); *United States v. McNeill*, 887 F.2d 448 (3d Cir. 1989). Fisher attempts to distinguish *Wong* by pointing out that the two enhancements at issue in that case "related to different activities and respond to different harms that could apply to the offense of conviction." (D.I. 33 at 9.) Assuming *arguendo* that his characterization of *Wong* is accurate, the distinction Fisher points to is immaterial in light of the above-cited comment of the Sentencing Commission accompanying section 1B1.1: "[i]n some cases, such enhancements, adjustments, and determinations may be triggered by the same conduct."[12] The only case Fisher cites that provides some affirmative support to his argument, *United States v. Chichy*, 1 F.3d 1501 (6th Cir. 1993), is no longer good law. *United States v. Cobleigh*, 75 F.3d 242, 251 (6th Cir. 1996) ("The Sentencing Commission's regulations have thus abrogated the holding[] of . . . *Chichy*."). Furthermore, the court is unpersuaded by Fisher's claim that the official-victim enhancement is unwarranted unless the conduct "evidences activity more directed at an officer than occurred here." (D.I. 28 at 13.) This argument is of little (if any) weight, especially in a case such as this where the defendant pointed a loaded gun at an officer.

## IV.   CONCLUSION

Based on the above findings of fact and conclusions of law, the court calculates Fisher's total offense level to be 29. With a criminal history category of III, the range of imprisonment recommend by the Sentencing Guidelines is, therefore, 108-120 months.

---

[12]Fisher also claims that *McNeill* and *Green* are distinguishable, but he fails to adequately explain the nature and/or significance of those distinctions in his brief.